**ST. JOSEPH EQUIPMENT, Plaintiff,**

v.

**MASSEY–FERGUSON, INC., Defendant.**

**Civ. A. No. 78–C–436.**

United States District Court,
W. D. Wisconsin.

Sept. 13, 1982.

Jeffrey M. Gallagher, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for plaintiff.

Edward H. Graham, Gen. Counsel and Sec'y, Des Moines, Iowa, Claude Covelli, Boardman, Suhr, Curry & Field, Madison, Wis., for defendant.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

This action arises from alleged violations of a dealership agreement. The plaintiff is and has been since 1958 a dealer of products manufactured or sold by the defendant Massey-Ferguson, Inc. This relationship was memorialized in a "Dealer Sales and Service Agreement" executed March 15, 1976 between the plaintiff and the defendant which established the plaintiff as a dealer of those M–F products identified in a "Product Supplement," another document executed by the parties on the same day. The Product Supplement covered "Construction Machinery Manufactured And/Or Sold By Company," including parts and accessories, in the crawler tractor, wheel loader, and excavator categories.

M–F, a subsidiary of M–F, Ltd., which is not a party to this suit, manufactured only one piece of construction equipment in this country. The remainder of its construction equipment line was imported from Germany and Italy, where it was manufactured by other corporate subsidiaries of M–F, Ltd., and distributed by M–F, Inc. to its North American dealers. In response to substantial annual losses on the sale of construction machinery as well as a declining market share in that product line, a decision was reached by M–F in early 1978 to withdraw from the construction machinery market in North America. By Mailgram dated March 16, 1978, M–F notified the plaintiff (and all other M–F dealers of construction machinery in North America) of its decision to discontinue marketing construction machinery in North America.

The plaintiff and another M–F dealer, since dismissed from this action, commenced suit in Dane County Circuit Court alleging that the withdrawal from the construction machinery market in North America violated certain provisions of the Wisconsin Fair Dealership Law, Chapter 135, Wis.Stats., in that the decision terminated the plaintiff or changed the competitive circumstances of its dealership agreement without good cause and without requisite notice. A second claim alleges a breach of fiduciary duty owed the plaintiff by the defendant, a third claim alleges breach of contract, namely the Dealership Agreement, and a fourth claim alleges a breach of the defendant's implied duty of cooperation —i.e., not to hinder the plaintiff in its performance of the Dealership Agreement. Upon the defendant's petition the action was removed to the U. S. District Court for the Western District of Wisconsin. In 1980, I was designated to sit as a Judge of the Western District to hear this case. The defendant now moves for summary judgment dismissing all claims against it.

### WFDL Claim

The essence of the plaintiff's Wisconsin Fair Dealership Law (WFDL) claim is that in choosing to withdraw from the construction machinery market in North America the defendant in effect terminated the plaintiff's dealership since the plaintiff concentrated its efforts on the construction machinery line. The withdrawal is alleged to be a substantial change in the competitive circumstances of the Dealership Agreement which, under the terms of § 135.03, Wis.Stats., cannot be done without "good cause." In support of its motion for summary judgment on this claim the defendant

argues first that the withdrawal decision neither terminated nor substantially changed the competitive circumstances of the Dealership Agreement, and second, that to apply the prohibitions of the WFDL to this situation would produce an absurd result not intended by the Legislature—namely of compelling M–F to stay in a losing business or to pay damages to go out of business.

Section 135.03, Wis.Stats., reads as follows:

> "135.03 Cancellation and alteration of dealerships. No grantor, directly or through any officer, agent or employe, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a Dealership Agreement without good cause. The burden of proving good cause is on the grantor."

I am not inclined to accept the defendant's hypertechnical argument that the decision it made did not affect the competitive circumstances of the Dealership Agreement. It is true that the agreement itself is not expressly terminated by the March 16 communication announcing M–F's withdrawal decision. But the operative statutory language, as I see it, is the words "competitive circumstances," not the word "agreement." Moreover, a reasonable argument could be made that the withdrawal of a dealer's entire product line amounts to a *de facto* termination of the Dealership Agreement. Yet in spite of the facially apparent applicability of the statutory language to the defendant's conduct, I am of the opinion that the WFDL's prohibitions are not applicable in cases where, as here, the grantor undertakes a non-discriminatory withdrawal from a product market on a large geographic scale.

It is appropriate to begin this analysis with the words of the WFDL itself. As noted above, § 135.03 prohibits the termination, non-renewal, cancellation or substantial change of a Dealership Agreement without good cause. Ordinary common sense would suggest that a company with a product which is not selling, and on which the company is losing money, has good cause to drop the product from its line. Indeed, such a decision would seem to be an example of sound business judgment. Furthermore, it might be expected that dealers of that product, especially those who deal exclusively in it, would be adversely affected by such a decision. Yet this notion of good cause does not appear to be within the scope of the WFDL's definition of the term in § 135.02(6), Wis.Stats.:

> "(6) 'Good cause' means:
>
> (a) Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed by other similarly situated dealers either by their terms or in the manner of their enforcement; or
>
> (b) Bad faith by the dealer in carrying out the terms of the dealership."

The term "good cause" as defined by statute relates only to some sort of dealer shortcoming, not to non-dealer related business exigencies of the grantor. Assuming, as I do, that a company's choice to cease manufacturing or marketing a product may well be the practical equivalent of terminating a dealership or at the very least a substantial change in its competitive circumstances, § 135.03 in conjunction with 135.02(6) would prevent a company from making such a decision without risking liability.

Such a conclusion raises some disturbing questions: Is a company with a poorly-selling product compelled to keep making and/or selling it, even at a loss, because § 135.03 won't permit it to drop the product? Must a company desirous of withdrawing from a particular geographic market—the entire North American continent, for example—continue operating in that market, even at a loss, because the effect of such a withdrawal on dealerships would be

impermissible under the Act? Because the Act's prohibitions extend also to non-renewals, would a company in the above situations be compelled to renew dealerships in perpetuity or until its ultimate financial ruin? Should dealers such as the plaintiff be permitted to extract damage awards from corporate grantors simply because those grantors have become victims of a business downturn? To answer any of these questions in the affirmative would surely be to let the tail wag the dog. More seriously, it has the potential to precipitate some formidable constitutional questions. See: *Designs in Medicine, Inc. v. Xomed, Inc.*, 522 F.Supp. 1054 (E.D.Wis.1981); *Consumers Oil Corp. v. Phillips Petroleum Co.*, 488 F.2d 816 (3d Cir. 1973).

But I do not think the WFDL is intended to apply to such situations. The underlying purposes of the Act are set forth in § 135.-025, Wis.Stats., among which are the following:

> "(a) To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;
>
> (b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;"

It would hardly be consistent with notions of "fair business relations" or "the continuation of dealerships on a fair basis" to force a grantor to endure substantial financial loss to enable a dealer to continue selling certain products. For whatever else may be said about the grantor-dealer relationship, the dealer and the dealer's function is in most instances the final link in the realization of the ultimate corporate purpose—the delivery of a product or service for profit. Nor is it, in my view, "unfair treatment" of a dealer for a grantor to make a product or total market withdrawal affecting all dealers in a certain geographic area non-discriminatorily. As the defendant points out, a dealer's continued operation depends in large part upon the well-being of the grantor and, ultimately, the profitability of the grantor's business. Where the problem is related to a particular dealer's unsatisfactory performance, the specific prohibitions of the WFDL guard against high-handedness on the part of the economically more powerful grantor while still allowing the grantor some flexibility to rectify matters. But where the problem or the motivation for the grantor to act is larger than a question simply of the performance of a particular dealer, the WFDL's underlying purposes must govern. Consistent with those purposes, it is my conclusion that where, as here, a grantor makes a non-discriminatory product withdrawal over a large geographic area, that, without more, is not a violation of § 135.03, Wis.Stats.

During the pendency of this motion, Judge Crabb of this district issued a decision in *Kealy Pharmacy & Home Care Service, Inc., et al. v. Walgreen Co.*, 539 F.Supp. 1357 (1982), holding that a grantor's decision to terminate all of its independently-owned drugstore dealers nationwide in order to have only company-owned stores violated the WFDL. In reaching this conclusion, Judge Crabb rejected the "fair treatment" argument for several reasons: first, it is unlikely that the Legislature intended the term "fair" to mean only even-handed or impartial (so as to permit a grantor to do anything as long as it is done to everyone); second, the Legislature at one time rejected a proposed amendment to the WFDL which would have exempted from the Act's prohibitions a grantor's withdrawal from a geographic market; and third, large scale termination or complete withdrawal is no less harsh on individual dealers than would be the same grantor action with respect to a single dealer or something less than all of them. Although I agree with the result in *Kealy* based upon its facts, I believe the court's fair treatment analysis suffers from the improper assumption that fairness under the Act is to be judged only from a dealer's perspective and further that

harshness, which I take to mean adversity of effect, is functionally related to fairness.

The WFDL's purpose to promote "fair business relations between dealers and grantors" and "the continuation of dealerships on a fair basis" is sufficiently broad to encompass the interests of grantors as well as dealers. Fairness under the Act, then, must be viewed in a broader perspective than simply what is good for dealers, and therefore grantor actions which might be called even-handed or non-discriminatory may be distinguished from individual or isolated actions even though the effect on the dealers involved might be the same. Nor is it logical to extend the WFDL's prohibitions to the grantor action involved in this case on the ground that the effect on the dealers is every bit as harsh as it would be in the termination of an individual dealer without statutory good cause. The WFDL may well serve to shield dealers from some harsh treatment at the hands of grantors, but it could hardly be expected to isolate them from economic reality which, as we all know only too well, is harsh enough but not necessarily unfair, except perhaps in some cosmic sense unrelated to business practicalities. Because I think the analysis in *Kealy,* when applied to the facts of this case, produces not only an unsatisfactory result but one unintended by the Legislature, I decline to follow it.

In a case involving a preliminary injunction sought under the WFDL by a dealer against a grantor wishing to withdraw entirely from the Wisconsin market, District Judge Robert W. Warren of the Eastern District of Wisconsin concluded that he wasn't compelled to reach the thorny question posed by the prohibitions of § 135.03 because the dealer there also alleged a violation of the notice provisions of § 135.04. Determining that the 90-day notice requirement was a constitutionally permissible limitation upon a grantor's right to cease operations in this state, Judge Warren ruled that the grantor's non-compliance with the notice requirement supported the issuance of a preliminary injunction. *Designs in Medicine, Inc., supra,* at pp. 1058–1059.

Here, too, the plaintiff has alleged a violation of the 90-day notice provision of § 135.04. While it might be argued that the 90-day notice provision is only applicable to those terminations, cancellations, non-renewals, or changes undertaken pursuant to § 135.03, i.e., those occasioned by some dealer-related problem (especially since the notice statute provides for a 60-day period in which a dealer may rectify deficiencies), it would be more harmonious with the overall purpose of the WFDL to apply the notice requirement even to situations such as this case. As the court in *Designs in Medicine* stated, relying upon the Wisconsin Supreme Court's opinion in *White Hen Pantry v. Buttke,* 100 Wis.2d 169, 301 N.W.2d 216 (1981), the only exceptions to the notice requirement are those provided in that section of the statute. Even in cases such as this one, where there are no deficiencies for a dealer to cure, it furthers the Act's policy of fairness in business relations to require the grantor to provide the dealer with notice of an impending change in his business circumstance. For even if the dealer is without power to rectify the problem and forestall future changes in his business operations, fairness would provide him with a reasonable opportunity to arrange for the orderly accomplishment of whatever changes are to be wrought including, if necessary, the investigation of new dealership opportunities.

■ In this case the March 16, 1978 Mailgram from M–F informing the plaintiff (and all other M–F dealers) of the defendant's choice to withdraw from the North American market is not worded as an advance notice; rather, it appears from the face of the communication that the change had already taken place. The notice also states, however, that "[r]etail sale of existing inventory will be in accordance with our current contracts and procedures as supplemented by a special discount policy for these products." Thus it is not readily ap-

parent that M–F's decision to stop importing construction machinery would result in immediate interruption or impairment of dealership operations, or for how long the plaintiff might expect to operate its business as usual. The affidavit of W. W. Hope, a Regional Manager for M–F, states that sales of M–F construction machinery continued until the last machine was sold on October 31, 1981, or nearly three and one-half years after the Mailgram notice to the plaintiff. Hope also indicated that subsequent to receipt of the notice the plaintiff purchased $1,151,408.00 worth of construction machinery. Alexander MacCleod, an M–F Regional Manager, testified in his May 17, 1979 deposition that at the time the notice was sent to dealers there was approximately a year's supply of construction machinery in M–F's inventory. Yet William Schams, Jr., President of the plaintiff corporation, states in his affidavit that subsequent to the notice the supply of parts dwindled and the orders for them either went unfilled, were delayed, or were available only at excessive prices.

On the basis of this record I am unable to determine whether the March 18, 1978 Mailgram in fact satisfied the 90-day notice requirement of § 135.04, Wis.Stats., since the record does not reveal whether, or to what extent, the status quo was preserved for any period of time subsequent to the notice. An ancillary, though closely related question, should it turn out that the March 18, 1978 Mailgram did not constitute sufficient notice under the WFDL, is what, if any, damages the plaintiff sustained because of that non-compliance.

Rule 56(d), Federal Rules of Civil Procedure, permits the district court to salvage some of the effort expended on a summary judgment motion by narrowing the issues in controversy and "directing such further proceedings in the action as are just." Although the defendant's motion for summary judgment on the WFDL claim will be denied, in light of this provision and also of the foregoing discussion declaring § 135.03

inapplicable to this lawsuit, any further proceeding on this claim will be limited to the issue of the defendant's compliance with § 135.04, Wis.Stats., and the related damage issue.

### Remaining Claims

■ The defendant also seeks judgment dismissing the remainder of the plaintiff's claims. It requires little analysis to conclude that such disposition is warranted. As to the claim that M–F's decision to stop importing construction machinery was a breach of the dealership contract, the clear wording of the agreement authorizes such conduct. Paragraph 14 of the Dealership Agreement states:

> "The Company reserves the right to allocate available Products among dealers, to reclassify or regroup Products, and to improve, modify, discontinue or replace Products without incurring any obligation or liability whatsoever to Dealer, including, without limitation, any obligation to replace or make corresponding changes in any Products previously shipped to Dealer."

Nor do I see anything in the Product Supplement to contradict this language. The plaintiff appears to argue that the Product Supplement, which identified the plaintiff's product line as construction machinery, was in effect a promise to the plaintiff by M–F not only to sell it construction equipment during the effective term, but also to continue to import or manufacture the products for that time certain. Such an argument would render ¶ 14 of the Agreement virtually useless as it is written, or would implicitly rewrite that provision to state that M–F could only change, modify, or discontinue products at the end of a supplement term. This is a far cry from what ¶ 14 actually says, and any sensible reading of the two documents leads to the conclusion that the Product Supplement, which simply clarifies the product line whose sale is the very purpose of the whole agreement, is subject to the general terms of the

Agreement. In summary, it is clear as a matter of express contractual language that under the terms of the Dealership Agreement M–F had the authority to do as it did in this case and therefore the contract was not breached.

■ The plaintiff also contends that its relationship with M–F over the years, particularly the mutuality of interest and the dealer's loyalty and sacrifice to develop M–F's products, engendered a fiduciary relationship which, too, has been breached by M–F's decision. The details of the plaintiff's long relationship with M–F as set forth in Mr. Scham's affidavit is, in my view, characteristic of dealership relations in general, and I have in a previous case expressed my view that such relationships are purely contractual, not fiduciary. *Amoco Oil Co. v. Cardinal Oil Co., Inc., et al.,* 535 F.Supp. 661 (E.D.Wis.1982), pp. 8–9.

Finally, inasmuch as I have already determined that in making its decision M–F was exercising a right reserved to it under the contract, it follows without more that the decision could not be a breach of any implied duty to cooperate in permitting the plaintiff to perform its duties under the contract.

On the basis of the foregoing,

IT IS ORDERED:

1. That the defendant's motion for summary judgment on the plaintiff's WFDL claim is denied but that in further proceedings on this claim the plaintiff is limited to the issue of M–F's compliance with § 135.-04, Wis.Stats., and any related damages.

2. That the defendant's motion for summary judgment on the remainder of the plaintiff's claims is granted.