COMPUTRONICS, INC., Plaintiff,

v.

APPLE COMPUTER, INC., and The Board of Regents of the University of Wisconsin System, Defendants.

No. 84–C–837.

United States District Court, W.D. Wisconsin.

Jan. 16, 1985.

Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for plaintiff.

Foley & Lardner, Milwaukee, Wis., Kevin J. O'Connor, Asst. Atty. Gen., Madison, Wis., for defendants.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Before the Court is a motion by defendant Apple for summary judgment. Also pending is a renewed motion by the defendant Board of Regents for dismissal grounded in Eleventh Amendment immunity, which was filed in response to plaintiff's amended complaint. The Court previously dismissed the claims against the Board of Regents in the original complaint. As the amended complaint does not change the theories pertaining to the Board of Regents, the Court's previous opinion is dispositive of this motion and it will be granted. The amended complaint also adds several misrepresentation claims against Apple which did not appear in the original complaint. These claims are not addressed in the pending motion. Both the original complaint and the amended complaint contain claims against Apple based on the Robinson-Patman Act, 15 U.S.C. § 13(a); and the Wisconsin Fair Dealership Law, § 135.-01 *et seq.*, Wis.Stats.; and on contract. It is toward these claims that the motion is directed.

## FACTS

The facts of this case will be discussed throughout this opinion. The background is as follows: Plaintiff, Computronics, Inc., is a Wisconsin corporation engaged in the retail sale of personal computer hardware and software in Madison, Wisconsin. Apple Computer, Inc., the remaining defendant, is a major manufacturer and seller of microcomputers and related items nationwide from its offices in Cupertino, California.

On March 1, 1984 plaintiff and defendant entered into an "Authorized Apple Dealer Sales Agreement" wherein plaintiff would

purchase Apple products for resale to retail customers in the Dane County, Wisconsin area. The contract provides, in pertinent part, as follows:

Preamble, at paragraph D.

D. Accordingly, Apple sells such Products for resale to retail customers only to authorized Apple dealers who have demonstrated and continue to demonstrate to Apple's satisfaction that they have the technical capability to explain, demonstrate, service and support Apple Products properly, maintain adequate display and demonstration facilities for that purpose, possess the ability to develop and serve the respective marketing areas in which they conduct their businesses, and otherwise discharge the responsibilities described in this Agreement.

NOW, THEREFORE, Apple and Dealer hereby agree as follows:

1. APPOINTMENT AS AUTHORIZED APPLE DEALER.

*　　*　　*　　*　　*　　*

(b) Dealer's appointment as an authorized Apple Dealer shall be non-exclusive and such appointment does not constitute a grant of any specific territory, geographical area or particular market. Apple reserves the right to appoint other authorized dealers and resellers, and to make direct sales to anyone at any time without notice or liability to Dealer.

In 1983 and 1984, the University of Wisconsin, principally through its Office of Information Technology, investigated methods by which it could equip its students and staff with personal computers. At its Academic Computing Center (MACC), the University displayed and gave hands-on experience to students and staff in personal computers manufactured by IBM, Digital Equipment Corporation and others. It also entered into agreements providing discounts to students and staff, although the University was never in the chain of title of the hardware. A similar program with Apple, the University Consortium, was in place in early 1984.

Negotiations and planning concerning a more ambitious program took place during 1984, and on October 3, 1984, Apple and the University entered into an agreement whereby the University agreed to purchase not less than $10 million worth of computers (specifically the MacIntosh and Lisa models) by June 30, 1986. The purchase price to the University was at a significant discount, and the contract allowed resale to staff and students conditional on no further resale by them. According to the complaint and lists submitted by Apple, several of the products sold to the University are delivered at prices below that charged to the plaintiff. In fact, the prices charged by the University for resale to students and staff are often lower than those charged by Apple to plaintiff.

MEMORANDUM

## I. *Robinson-Patman Act*

A *prima facie* case of price discrimination under the Robinson-Patman Act is not of concern at this time. The motion of Apple presents two affirmative defenses which assume the existence of price discrimination:[1] the business necessity defense, found at 15 U.S.C. § 13(b); and the Nonprofit Institutions Act, found at 15 U.S.C. § 13c.

█ The business necessity defense, discussed generally in *Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983), is clearly not amenable to summary judgment at this stage despite plaintiff's less-than-adequate responses to Apple's proposed findings of fact.[2] As the Court in that case

---

1. Apple contends that its prices were justified by "due allowance for differences in the cost of sale and delivery to the University ..." and that sales to a state agency are exempt from the Act. Both of these defenses put into dispute the fact of a *prima facie* case, but are not advanced in this motion.

2. Plaintiff's plea that it lacks access at this time to the information needed to rebut the defense has some merit, but its repeated reference to over 50 pages of testimony from the preliminary injunction hearing sadly lacks the specificity required by the Court's instructions concerning summary judgment motions. Although not

stated, citing *Continental Baking Co.*, 63 F.T.C. 2071, 2163 (1963):

> At the heart of Section 2(b) [15 U.S.C. § 13(b)] is the concept of "good faith." This is a flexible and pragmatic, not a technical or doctrinaire, concept. The standard of good faith is simply the standard of the prudent businessman responding fairly to what he reasonably believes is a situation of competitive necessity.

*Id.* 103 S.Ct. at 1292. In the circumstances of this case, which are different than both *Falls River* and *FTC v. Staley Mfg. Co.*, 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1945) which the Court in *Falls River* distinguished, there is perhaps an element of subjective judgment necessary to decide the question of business necessity. In addition, it is possible that the differences in marketing program between Apple and its competitors could be shown to be necessary by virtue of Apple's market position vis a vis IBM, for instance. Assuming that the price offered by Apple for Apple's competitive product in the target market was necessary to gain entry, a lower price might still be said to "meet, but not beat," the competition.

But it is clear that the facts regarding business necessity cannot be said to be sufficiently established to support summary judgment.

■ Alternatively, summary judgment on the Robinson-Patman claim could be granted if the application of the Nonprofit Institutions Act were clear. But it is not. Even if it is assumed that providing faculty and students with computers serves an educational purpose, the Apple-University contract allows non-instructional staff, such as janitors, to purchase the product at a discount. Although purchasers through the University are forbidden to resell merchandise, there is no realistic way to forbid such purchasers from using the merchandise in other than an educational sense. After all, a student could purchase a computer shortly before leaving the University

with the intention of using it in business after graduation.

With respect to the question of educational purpose, *Abbott Laboratories v. Portland Retail Druggists*, 425 U.S. 1, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976) provides significant support for the proposition that the sales by Apple to the University are exempt under § 13c. For the reasons set forth above, however, there is a question, not answerable on this motion, whether the limitations on the program are sufficient. Further, *Abbott* leaves some room to doubt that some of its more sweeping language is fully applicable to nonconsumables sold by a University. It is evident that the expansion of the functions of a hospital over time had significant influence on the Court. A University, on the other hand, is blessed with the ability to make almost anything serve an educational purpose. For instance, putting stereo equipment in the hands of students could contribute to their appreciation of music. The educational purpose served by putting computers into the hands of students and staff are arguably quantitatively more educationally beneficial, but not different, in kind. Finally, the Court in *Abbott* cited with approval the decision in *Students Book Company v. Washington Law Book Co.*, 232 F.2d 49 (D.C.Cir.1955), cert. den. 350 U.S. 988 (1956). In the context of this discussion, it must be noted that the existence of educational purpose to these sales is important as it relates to the phrase "for its own use" in § 13c. The resale of books for a profit by a campus bookstore was held, in *Students Book Company*, to be outside of the ambit of § 13c. While it is not clear from the decision or the comments of the Supreme Court about the case (96 S.Ct. at 1316–17, note 10), this Court does not believe that the profit motive was determinative, but rather that the resale was.

Accordingly, if for no other reason than the existence of material factual disputes, summary judgment on the Robinson-Patman Act claim must be denied.

---

addressed in this Court's order denying preliminary relief, the possibility of Apple's success on

this defense had some influence in that decision.

## II. *Contract and Fair Dealership*

In the Court's decision on plaintiff's request for a preliminary injunction, the Court noted that the contract terms respecting exclusivity were nonambiguous. Without room for equivocation, it is clear that Apple reserved to itself the broadest possible latitude to sell to whomever it pleased under whatever terms it chose.

▉ In its imaginative, but ultimately unpersuasive, discussion of paragraph (1)(b) of the contract, plaintiff correctly refutes Apple's argument that the sale of the merchandise to the University is a direct sale, if only because the agreement between Apple and the University contemplates resale to students and staff.[3] And it is conceded that the University is not an "authorized dealer" within the meaning of the Apple-Computronics dealership contract.

And, finally, it is also true, as plaintiff points out, that the terms "authorized dealer" and "reseller" must be mutually exclusive so that the rule of construction against surplusage can be observed. *Capital Investments, Inc. v. Whitehall Packing Co., Inc.,* 91 Wis.2d 178, 280 N.W.2d 254, 261 (1979). It is at this point that plaintiff's argument breaks down. The attempt to read ambiguity into the word "reseller" in the context of this contract is hopelessly fraught with overreaching. Plaintiff has made no showing that the term has some meaning of art in the industry, but only suggests that the term could mean "value added reseller" (the University is not selling at a profit).

The contract is plain and unambiguous on its face. Apple could market its merchandise in two general ways (aside from, perhaps, giving it away): selling direct and selling to those who would resell. Direct sales are taken care of, in no uncertain terms, by the last clause of paragraph (1)(b). However, no less certain is the language used in the previous clause regarding resale. Authorized dealers are one kind of reseller and "reseller" is clearly meant to cover, within the broadest possible reservation of rights, any other kind of retailer or wholesaler who is not an authorized dealer. The failure to use the term "to anyone at any time" (which is used in conjunction with direct sales) in no way undercuts the clarity of the contract.

Furthermore, plaintiff's attempt to create implied agreements not to do what Apple has done are doomed to failure in light of the integration clause of the contract (at paragraph 17). It clearly and unambiguously cancels any pre-existing agreements, requires that modifications must be in writing, and provides:

> Dealer acknowledges that it is not entering this Agreement on the basis of any representations not expressly contained herein.

Accordingly, the contract claim is without merit.

▉ It is also clear that the Fair Dealership claim falls for precisely the same reason. If Apple's conduct conforms to what it expressly reserved the right to do in the agreement, then that conduct cannot be said to "change the competitive circumstances of the dealership agreement." (§ 135.04, Wis.Stats.) This is the explicit holding of the oft-cited case of *Ed Phillips & Sons, Madison, Inc. v. Ed Phillips & Sons Co.,* 1975 Trade Cases (CCH), ¶ 60,106 (Dane County, Wisconsin, Cir.Ct.1975). Therefore, the Fair Dealership is equally without merit.

Accordingly,

### ORDER

IT IS ORDERED that the motion of defendant Apple Computer, Inc. for summary judgment is GRANTED with respect to plaintiff's claims under the Wisconsin Fair Dealership Law and contract, and is otherwise DENIED.

---

**3.** In this regard, it is important to note that the University recognized that this was not a direct sale within the generally understood meaning of that term. It understood that it holds title to the goods, and then transfers that title to an end user. See testimony and affidavit of Tad Pinkerton, head of the Office of Information Technology.

IT IS FURTHER ORDERED that the motion of the defendant Board of Regents of the University of Wisconsin System to dismiss the complaint as to it is GRANTED under the terms of the Court's previous order of December 24, 1984.