SUPER VALU STORES, INC., a Delaware
corporation, Plaintiff-respondent,

v.

D-MART FOOD STORES, INC., a Wisconsin
corporation, and William C. Cahak,
Defendants-Appellants,

NEKOOSA PORT EDWARDS STATE BANK, a
Wisconsin banking institution, Defendant.†

Court of Appeals

*No. 87–1633. Submitted on briefs June 24, 1988.—Decided
September 22, 1988.*

(Also reported in 431 N.W.2d 721.)

† Petition to review denied.

569

For the defendants-appellants the cause was sub-
mitted on the briefs of *William A. Schroeder* and
*Sommer, Olk & Schroeder,* of Rhinelander.

For the plaintiff-respondent the cause was sub-
mitted on the brief of *Herbert Terwilliger* and *Terwil-
liger, Wakeen, Piehler & Conway, S.C.,* of Wausau, and
*Rhea A. Myers* and *Stroud, Stroud, Willink, Thompson
& Howard,* of counsel, of Madison.

Before Dykman, Eich and Sundby, JJ.

EICH, J.   Appellant William Cahak, through his
wholly-owned corporation, D-Mart Food Stores, Inc.,
operated a grocery store in Wisconsin Rapids under a
"retail sales agreement" with the respondent, Super
Valu Stores, Inc., a nationwide grocery wholesaler.
Super Valu sued Cahak and D-Mart, seeking money
damages on an open account for merchandise and
services supplied to the store under the agreement.
Cahak and D-Mart counterclaimed, asserting several
causes of action. The trial court granted partial
summary judgment dismissing the counterclaims, and
the case proceeded to trial on several issues irrelevant
to this appeal.

Cahak and D-Mart challenge the dismissal of the
counterclaims and also a portion of the final judgment
holding Cahak personally liable for D-Mart's obliga-
tions to Super Valu. The issues are: (1) whether Super
Valu's plan to open another store in Wisconsin Rapids

violated the Wisconsin Fair Dealership Law, ch. 135, Stats.; (2) whether the plan violated the "duty of good faith" Super Valu owed to D-Mart as a party to the retail sales agreement; (3) whether Cahak's counterclaim for defamation was barred by reason of his failure to give Super Valu written notice of the claim as required by sec. 895.05(2), Stats.; and (4) whether, under the terms of their several agreements, Cahak may be held personally liable for D-mart's debt to Super Valu on the open account. All are questions of law which we decide independently, owing no deference to the trial court's decision. *Muggli Dental Studio v. Taylor,* 142 Wis. 2d 696, 699, 419 N.W.2d 322, 323 (Ct. App. 1987).

Because Cahak's dealership agreement was nonexclusive and allowed Super Valu, in its sole discretion, to franchise other dealerships, we see no violation of the fair dealership law, and no violation of Super Valu's obligation to deal with Cahak in good faith. We are also satisfied that Cahak's counterclaim for defamation was barred for failure to comply with the notice requirements of sec. 895.05(2), Stats., and was otherwise legally insufficient. Finally, we conclude that the trial court correctly ruled that Cahak personally guaranteed D-Mart's payments to Super Valu on the open account. We therefore affirm the judgment.

Super Valu is a nationwide franchisor of both "conventional" and large "warehouse"-type grocery stores. In 1976, Super Valu, D-Mart and Cahak entered into a series of agreements under which D-Mart would open and operate a conventional grocery store in Wisconsin Rapids.

The basic contract, the "retail sales agreement," allowed D-Mart to advertise itself as a "Super Valu"

store and to use the Super Valu insignia and emblems in its business. It also allowed D-Mart to purchase merchandise and related services from Super Valu. The agreement did not grant D-Mart the exclusive right to operate a Super Valu store in Wisconsin Rapids or any other given territory. Rather, Super Valu retained the "right to choose and select its ... retailers and to enter into Super Valu Retailer Agreements with other parties at Super Valu's sole choice and discretion ...."

In addition to the retail agreement, the parties also signed a sublease for the store building and Cahak executed a personal guaranty "unconditionally, absolutely and continually guarantee[ing] the full and faithful payment and performance ... of all the terms, conditions and covenants contained in [the] Sublease ...." Among other things, the sublease required D-Mart to "enter into and comply with the provisions of, and at all times to conduct its business under[,] [the retail agreement] ...."

Several years later, Super Valu developed a plan to franchise a large "warehouse"-type grocery store in Wisconsin Rapids. In September, 1983, Super Valu disclosed its plans to a local newspaper, and an article soon appeared announcing that a new store was planned for the area. The article stated that Cahak would be given "first chance" to operate it. The parties could not negotiate an acceptable agreement for Cahak to take over the new store, however, and at some later date, Cahak closed his store. Super Valu sued D-Mart to recover amounts owing on an open account for merchandise. The action also asserted a personal claim against Cahak under the guaranty.

D-Mart and Cahak filed counterclaims alleging that Super Valu's plans to open a second store in

Wisconsin Rapids violated the fair dealership law and constituted a breach of its duty of "good faith dealing" under the contract. Cahak also counterclaimed individually, alleging that Super Valu had defamed him when it released the information which led to publication of the newspaper article announcing the planned opening of the new store. Super Valu moved for partial summary judgment dismissing the counterclaims and the trial court granted the motion. The remaining issues were tried to a jury and, among other things, the jury awarded Super Valu $142,743.28 on the open account claim. On motions after verdict, the trial court ruled that Cahak was personally liable for payment of the account under the terms of the guaranty.

Before addressing the issues, we should note that even though the case was tried to a jury, the heart of the appeal is the granting of Super Valu's pretrial motions for summary judgment. Those motions were heard and decided on the undisputed facts presented to the court at the time. As a result, whatever happened or did not happen at trial is irrelevant to our consideration of the motions. We address them on the record as it existed when they were decided by the trial court, not on a record expanded by the testimony at trial.

In presenting and arguing the summary judgment motions, the parties agreed to the general facts recited above. They also agreed that the Wisconsin Fair Dealership Law applied to their relationship, that Super Valu continued to treat D-Mart as a full dealer, denying it nothing to which it was entitled under the agreement until Cahak closed the store, and that Super Valu intended to open a large warehouse

grocery store approximately four blocks from Cahak's store. Other facts will be referred to as necessary.

## I. VIOLATION OF THE FAIR DEALERSHIP LAW

The Wisconsin Fair Dealership Law, ch. 135, Stats., was enacted to "promote the compelling [public] interest ... in fair business relations between dealers and grantors" and to "protect dealers against unfair treatment by grantors ...." Sec. 135.025(2)(a) and (b). In furtherance of these goals, sec. 135.03 provides that "[n]o grantor ... may ... substantially change the competitive circumstances of a dealership agreement without good cause."

Cahak argues that Super Valu's announcement that it was planning to open another store in the area "substantially changed the competitive circumstances of D-Mart" in violation of sec. 135.03, Stats. We disagree.

Cahak made the same argument to the trial court, and the court rejected it, relying on Judge Warren's rationale in a federal district court case, *Brauman Paper Co. v. Congoleum Corp.*, 563 F. Supp. 1 (E.D. Wis. 1981). In that case, the dealer, Brauman, attempted to enjoin the licensor, Congoleum, from awarding a dealership to a third party, claiming that this would violate sec. 135.03, Stats. The court rejected the claim, noting that the dealership agreement between Brauman and Congoleum was not exclusive, and holding:

> If the dealership agreement is not exclusive, then Congoleum's appointment of a new dealer will not "substantially change the competitive circumstances of the *dealership agreement*." "Dealership," as defined in section 135.02, "means a

contract or agreement . . . ." Thus, the appointment of a new dealer will not change the competitive circumstances of the *dealership agreement* of an existing dealer unless that agreement provides for exclusivity. *Brauman,* 563 F. Supp. at 3 (emphasis in original; citation omitted).

Cahak has referred us to three other federal district court cases, *Meyer v. Kero-Sun, Inc.,* 570 F. Supp. 402 (W.D. Wis. 1983), *St. Joseph Equipment v. Massey-Ferguson, Inc.,* 546 F. Supp. 1245 (W.D. Wis. 1982), and *Van v. Mobile Oil Corp.,* 515 F. Supp. 487 (E.D. Wis. 1981), claiming that they compel the opposite result. Two of them, however, are irrelevant to this case and the third has little, if any, value as precedent. *Meyer* is inapposite because the dealership agreement there provided the dealer with an exclusive area of operations. Cahak's agreement was nonexclusive. In *St. Joseph,* the licensor, Massey-Ferguson, withdrew its entire product line from sale in North America. The court, while remarking that such action could be considered "a *de facto* termination of the Dealership Agreement" within the meaning of the prohibition in sec. 135.03, Stats., against "terminat[ing such dealerships] . . . without good cause," nonetheless held that statute did not apply to Massey-Ferguson's withdrawal from the market. *St. Joseph,* 546 F. Supp. at 1247.

In the third case, *Van,* the licensor unilaterally cancelled the dealer's credit, requiring him to pay cash for all future deliveries of gasoline to his station. The court denied the licensor's motion for summary judgment, rejecting the argument that, as a matter of law, the change in credit terms did not constitute a change in the dealer's competitive circumstances and did not alter the dealership agreement. While there is

language in *Van* that might be considered inconsistent with the excerpt of *Brauman* quoted above—even though both were written by the same judge—we think the reasoning in *Brauman,* a more recent case, is the more appropriate. We note, too, that that reasoning finds support in other, still more recent, cases. *See, e.g., Computronics, Inc. v. Apple Computer, Inc.,* 600 F. Supp. 809, 813 (W.D. Wis. 1985); *Kinn v. Coast Catamaran Corp.,* F. Supp. 682, 686 (E.D. Wis. 1984).

Super Valu did not change the credit or any other terms of its agreement with D-mart; nor did it withdraw any product lines or take other action amounting to a *de facto* termination of the agreement. Indeed, one of the uncontroverted facts before the trial court on the summary judgment motions was that Super Valu continued to treat D-Mart as a dealer in all respects until Cahak closed the store.

More important, the retail sales agreement was nonexclusive. Under its terms Super Valu was free to enter into as many agreements with other retailers as it wished. We agree with the author of the dissent that ch. 135, Stats., should be liberally construed to promote its underlying purposes and policies. But here the plain language of the specific statute Super Value is alleged to have violated does no more than prohibit it from "chang[ing] the competitive circumstances *of [the] dealership agreement* ...." Sec. 135.03, Stats. (emphasis added). And because Super Valu's dealership agreement with Cahak specifically authorizes Super Valu to franchise other stores whenever and wherever it wishes, we do not see how the issuance of another franchise would change "the competitive circumstances of [the] dealership agreement" in viola-

tion of the law. To so read the statute would involve much more than a liberal interpretation—we would have to completely rewrite it, and this we may not do. Compliance with the express terms of the dealership agreement cannot, under the circumstances of this case, give rise to a violation of sec. 135.03.

## II. THE DUTY OF GOOD FAITH PERFORMANCE

Cahak contends that even if Super Valu's conduct comported with the terms of the agreement, Wisconsin law imposes an "independent duty of good faith" on all parties to a contract, and this duty required that Super Valu not franchise a second store in Cahak's market area.

Wisconsin law does recognize that "[e]very contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties." *Estate of Chayka,* 47 Wis. 2d 102, 107 n. 7, 176 N.W.2d 561, 564 (1970), quoting 17 Am. Jur. 2d *Contracts,* sec. 256, at 653 (1964) (footnote omitted). But where, as here, a contracting party complains of acts of the other party which are specifically authorized in their agreement, we do not see how there can be any breach of the covenant of good faith. Indeed, it would be a contradiction in terms to characterize an act contemplated by the plain language of the parties' contract as a "bad faith" breach of that contract.

Nor has Cahak's argument found favor in the courts. In *St. Joseph,* 546 F. Supp. at 1250, the dealership agreement reserved to Massey-Ferguson the right to "discontinue or replace Products without

incurring any obligation or liability whatsoever to Dealer ...." Because the company's decision to cease marketing its products was one it was entitled to make under the language of the contract, the court held that "it follows without more that the decision could not be a breach of any implied duty to cooperate in permitting the [dealer] to perform its duties under the contract." *Id.* at 1251. And, in *Amoco Oil Co. v. Cardinal Oil Co., Inc.,* 535 F. Supp. 661, 666–67 (E.D. Wis. 1982), the court, after examining the Wisconsin "good faith" cases, held that the fact that such a duty exists "does not ... make [the franchisor-franchisee] relationship a fiduciary one. ... '[I]t is primarily a standard business relationship and is governed by the language of the[ ] contract.'" (Citation omitted.) We agree, and we see no breach of the duty of good faith dealing in this case.

## III.   APPLICABILITY OF SEC. 895.05(2), STATS., TO CAHAK'S DEFAMATION CLAIM

One of Cahak's counterclaims alleged that he was defamed by information given to the press by Super Valu relating to its plans to open the new store. He claimed that the references to him in the newspaper's article would "cause the public ... to conclude that [he] would cease his affiliation with the business of D-Mart, and become associated with [Super Valu's] ... new ... operation ...." He alleged that, as a result of this information being made public—in light of the eventual closing of his D-Mart store—he "suffered a loss of public confidence in his management ... abilities ...."

The newspaper article made only a brief reference to Cahak. After outlining the plans for the new store,

it simply stated: "An existing Super Valu retailer in Wisconsin Rapids, William Cahak, will be given first chance at the new store .... Cahak operates D-Mart Super Valu at 2561 Eighth Street .... If he turns down the offer, Cahak will be free to continue operating his D-Mart store ...."

The trial court concluded that the paragraph was capable of conveying a defamatory meaning, but dismissed the counterclaim on grounds that Cahak had failed to give notice required by sec. 895.05(2), Stats. That section provides in part that, "[b]efore any civil action shall be commenced on account of any libelous publication in any newspaper, magazine or periodical, the libeled person shall first give those alleged to be responsible or liable for the publication a reasonable opportunity to correct the libelous matter ... by [giving] notice in writing specifying the article and the statements therein which are claimed to be false and defamatory and a statement of what are claimed to be the true facts."

Cahak argues that the statute is applicable only to media defendants, and thus he was not required to provide the notice to Super Valu. We held to the contrary in *Hucko v. Jos. Schlitz Brewing Co.,* 100 Wis. 2d 372, 377–81, 302 N.W.2d 68, 72–74 (Ct. App. 1981), and see no reason to depart from that holding in this case.

Even so, whether a publication is capable of conveying a defamatory meaning is a question of law for the court. *Ballenger v. Door County,* 131 Wis. 2d 422, 427, 388 N.W.2d 624, 628 (Ct. App. 1986). We have set forth the single paragraph in the article that is the subject of Cahak's defamation counterclaim; and,

579

considering the contents of that paragraph, we are compelled to state our disagreement with the trial court's conclusion that it was capable of conveying a defamatory meaning. We see no way the paragraph could reasonably be read to do so and conclude that the counterclaim was subject to dismissal on that ground as well.

## IV. CAHAK'S PERSONAL LIABILITY

The trial court correctly held that the retail sales agreement, the sublease and the guaranty, each one referring to the others and all three executed contemporaneously as part of a single transaction, should be construed together. *Milwaukee Acceptance Corp. v. Kuper*, 42 Wis. 2d 515, 517, 167 N.W.2d 256, 258 (1969). Doing so, the court held that Cahak's personal guaranty covered the past due payments to Super Valu for merchandise and services purchased by D-Mart under the terms of the dealership agreement.

Cahak argues that this was error because Super Valu had "a duty to disclose to him at the time that the various documents were executed ... that by executing the guaranty ... he was also obligating himself ... to pay ... fees and charges [under the dealership agreement]." Cahak bases the argument on *First Nat. Bank & Trust Co. v. Notte*, 97 Wis. 2d 207, 218, 293 N.W.2d 530, 536 (1980), which he cites for the proposition that a creditor has a duty to disclose to a surety facts known by the creditor but unknown to the surety, which increase the surety's risk. The case is inapposite, however.

*First National* was not a "duty to disclose" case; it involved active misrepresentation by the creditor. Here, Cahak does not suggest that Super Valu misre-

presented anything to him at any point in the transaction. He argues only that he should have been told at the time he signed the three documents that they were all related and that by signing the guaranty, he was obligating himself to pay for merchandise and services supplied by Super Valu under the retail sales agreement.

But the extent of Cahak's obligations under the various documents, their relationship, and the extent to which they bound him, were clear. By signing the guaranty, Cahak "unconditionally [and] absolutely ... guarantee[d] the full and faithful ... performance ... of all the terms, conditions and covenants contained in [the] sublease ...." By the terms of the sublease, D-Mart was required to "enter into and comply with the provisions of, and at all times to conduct its business under[, the retail sales agreement]." And the retail sales agreement required D-Mart to "[p]ay to Super Valu fees and charges for merchandise and services provided by Super Valu ...." It was plain on the face of the documents that the guaranty required full performance of the sublease and the sublease required full performance of the retail sales agreement. Taken together, they obligated Cahak to guarantee D-Mart's obligations under the retail sales agreement. The trial court held him to that obligation, as do we.

*By the Court.*—Judgment affirmed.

SUNDBY, J.  (*dissenting*). This appeal presents a first-impression issue of great public concern: Does the constructive termination of a dealership by a grantor without good cause violate sec. 135.03, Stats.?

D-Mart Food Stores, Inc., had a nonexclusive Super Valu retailer's agreement with Super Valu

Stores, Inc. William Cahak and his wife are the sole shareholders of D-Mart. There is no dispute that ch. 135, Stats., applies to the agreement.

Section 135.03, Stats., provides:

> No grantor ... may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor.

"Good cause" is defined in sec. 135.02(4) and deals only with failures and bad faith by a dealer. Thus, a grantor may not terminate a dealership agreement for business reasons which appear to the grantor to be justified. *See Kealey Pharmacy v. Walgreen Co.,* 761 F.2d 345 (7th Cir. 1985) (evenhanded nationwide termination of all dealerships violates WFDL). "[T]he Wisconsin Fair Dealership Law forces on the parties the equivalent of ... a [long-term dealership] contract, in the form of a nonwaivable prohibition against the franchisor's terminating the dealership without cause." *Moore v. Tandy Corp.,* 819 F.2d 820, 822 (7th Cir. 1987).

This case presents the question of whether a grantor by a constructive termination may avoid the consequences of an explicit termination of a dealership under sec. 135.03, Stats. Super Valu intends to open a 50,000 square foot County Market four blocks from D-Mart's store. It will lease County Market to a retailer.[1] Super Valu's market survey predicted that

---

[1]Super Valu presented its market analysis to Cahak. It indicated that "unencumbered" cash of $400,000 - $500,000 would be necessary to make the project a reality. The estimated necessary total investment was approximately two million dollars. Apparently Super Valu was willing to consider Cahak as the

the presence of a County Market in Wisconsin Rapids would render the D-Mart store unprofitable. Super Valu contends that its agreement with D-Mart is nonexclusive and permits it to enter into retailer agreements with other parties at its sole choice and discretion. Therefore, the fact that the County Market will put D-Mart out of business is simply irrelevant because there is no statute, decision or policy which insulates D-Mart, as Super Valu puts it, "from the tide of progress in a highly competitive industry." I conclude, however, that the WFDL is a dike which protects a dealer from being drowned in a flood of economic competition generated by its grantor.

The WFDL is to be liberally construed and applied to promote its underlying remedial purposes and policies. Sec. 135.025(1), Stats. One of those purposes is "[t]o protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships." Sec. 135.025(2)(b).

Super Valu seems to argue that because its agreement with D-Mart is nonexclusive it has no responsibility for the economic vitality or survival of D-Mart. Super Valu wholly ignores the benefits it received from the obligations D-Mart undertook to advance Super Valu's name and its products.[2] Under

retailer for County Market but he lacked the financial resources. Super Valu does not contend that an offer to Cahak would have excused compliance with ch. 135, Stats.

[2]It is undoubtedly bitterly ironic to D-Mart, and William Cahak as guarantor, that they are now compelled to pay Super Valu the value of the merchandise, inventory, furniture, trade fixtures and equipment purchased from Super Valu which Super Valu by its destruction of D-Mart's dealership has reduced to bankruptcy value.

the retailer's agreement D-Mart agreed to identify and advertise itself as a Super Valu retailer by the use of the Super Valu trade name, insignia, emblem and colors. It purchased merchandise and services from Super Valu and agreed to observe all standards and conditions and requirements for the protection of all Super Valu trademarks and trade names. Super Valu claims, however, that it did not "substantially change the competitive circumstances" of the dealership agreement because D-Mart is free to continue in business as before and enjoys the same privileges as any other Super Valu retailer. It claims that sec. 135.03, Stats., does not prevent it from adversely affecting D-Mart's ability to compete by its actions which do not directly affect the dealership agreement. The majority adopts that construction of sec. 135.03, relying on *Brauman Paper Co. v. Congoleum Corp.,* 563 F. Supp. 1 (E.D. Wis. 1981). *Brauman,* however, did not deal with a change in competitive circumstances which resulted in a constructive termination of the dealership. *Remus v. Amoco Oil Co.,* 794 F.2d 1238 (7th Cir.), *cert. dismissed,* — U.S. —, 93 L.Ed.2d 345 (1986), suggests the correct result when a grantor's competitive actions accomplish a constructive termination of a dealership.

Remus was a franchised Amoco gasoline dealer in Wisconsin who, in a class action, charged Amoco with violating the WFDL by adopting a "discount for cash" program. The court assumed that Remus and his class consisted of dealers who lost money under the program. While the court found that Amoco did not violate the WFDL by its discount program, it considered in dicta what the effect might be if a substantial change in competitive circumstances of the dealership effected a constructive termination.

First, the court pointed out that, "The statute's [135.03, Stats.] main purpose is to give dealers a kind of tenure—like federal judges, or teachers, or workers in establishments covered by collective bargaining contracts." *Remus*, 794 F.2d at 1240. It further stated:

> The provision about not "substantially chang[ing] the competitive circumstances of the dealership" may be intended simply to protect the dealer against "constructive termination," that is, against the franchisor's making the dealer's competitive circumstances so desperate that the dealer "voluntarily" gives up the franchise. Constructive termination is a problem in some employee tenure cases, where it is treated, as it should be, as termination. The Wisconsin Fair Dealership Law makes the equation explicit. Not only may the franchisor not terminate or fail to renew the franchise outright; the franchisor may not drive the dealer out of business—say by doubling the wholesale price to him only, so that he cannot [compete] against other dealers in the same product. ...
>
> ....
>
> The statute may go somewhat further than we have suggested and protect dealers against new competition that has substantially adverse although not lethal effects. The statute is primarily designed to benefit existing dealers ... and what most dealers fear more than anything else is that the franchisor will increase the amount of intra-brand competition by placing new outlets, whether franchised or franchisor-owned, too close to the existing outlet for comfort. But even if the Wisconsin Fair Dealership Law is designed to give franchised dealers in Wisconsin some protection against such moves by franchisors (an issue we need not decide), this cannot help Remus. Amoco

did not increase the number of dealers or open up new company-owned stations. [Citation omitted.]

*Id.* at 1240–41.

The court considered *Kealey,* where the court held that the WFDL prohibited Walgreen from terminating all its Wisconsin dealerships. *Remus,* 794 F.2d at 1241. In *Kealey* the court found that Walgreen was trying to eliminate dealers who had built its reputation in Wisconsin, so that it could open its own stores and appropriate the goodwill that the dealers had created. As to this the *Remus* court said:

> This was just the sort of conduct that the Wisconsin legislature had wanted to prevent. There is nothing like that in this case. Amoco isn't trying to drive its dealers out of business or even make life more difficult for them; although some dealers may lose from the change in policy that Remus attacks, others will gain.

*Id.,* 794 F.2d at 1241.

It is not suggested in this case that Super Valu has adopted a deliberate policy to eliminate dealers in Wisconsin Rapids so that its new County Market will be a more attractive and financially successful dealership. If, however, we adopt the narrow construction of "dealership agreement" of sec. 135.03, Stats., which the majority proposes, we expose dealers to exactly that possibility. A grantor such as Super Valu could appropriate the goodwill of its dealers by opening grantor-owned stores with which the dealers could not compete. As Judge Posner observed in *Remus,* this is exactly the kind of economic misconduct the WFDL is designed to protect dealers against. *Remus,* 794 F.2d at 1241.

Even if in this case Super Valu is motivated simply by rugged American entrepreneurism, it may not use its superior economic power to make its dealers' competitive circumstances so desperate that the consequences are fatal to the dealer. Because I believe that the WFDL protects D-Mart against this result, I respectfully dissent.