Ralph **REMUS** and **Ralph's Standard, Inc.**, individually and on behalf of a class of persons similarly situated, Plaintiffs-Appellants,

v.

**AMOCO OIL COMPANY,**
Defendant-Appellee.

No. 85–2210.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 25, 1986.

Decided July 3, 1986.

George P. Kersten, Kersten & McKinnon, Milwaukee, Wis., for plaintiffs-appellants.

Frank Cicero, Jr., Richard C. Godfrey, Kirkland & Ellis, Chicago, Ill., Stuart Parsons, Quarles & Brady, Milwaukee, Wis., for defendant-appellee.

Before BAUER and POSNER, Circuit Judges, and MOODY, District Judge.[*]

POSNER, Circuit Judge.

The plaintiff, Remus, a franchised Amoco gasoline dealer in Wisconsin, brought this diversity suit against Amoco on his own behalf and that of similarly situated dealers. The suit charges Amoco with having violated the Wisconsin Fair Dealership Law, Wis.Stat. § 135.01 *et seq.*, as well as common law fraud and contract principles, by adopting a "discount for cash" program. The district judge granted Amoco's motion for summary judgment and dismissed the case, 611 F.Supp. 885 (E.D.Wis.1985), and Remus has appealed, presenting novel and important questions under the Fair Dealership Law that we must try to answer as best we can from the words of the statute—for there is no pertinent legislative history, no similarly worded statute in another state, and no decision by a Wisconsin court interpreting the statute in any respect pertinent to this case.

Amoco like other major gasoline suppliers offers customers a credit card, free of charge, that they can use to buy gas and other products from Amoco's franchised dealers, such as Remus. Before the adoption of the discount for cash program in 1982, Amoco had not charged dealers separately for the cost of the credit card system, which is considerable ($150 million in 1981). One cost is the time value of money—the owner of the credit card pays no interest if he pays his bill within a specified period. There are also collection and other administrative costs. All the costs were built into the wholesale price of Amoco's gasoline, that is, the price that Amoco charged the dealers, and that the dealers passed on to their customers. The result

[*] Hon. James T. Moody of the Northern District of Indiana, sitting by designation.

was that a customer who paid cash was paying a part of the costs of the credit card system even though he was not receiving any of its benefits. A system under which one group of customers subsidizes another ("cross-subsidization") is difficult to sustain under competition, because the customers who are charged the higher prices to subsidize the customers who are charged the lower prices are an inviting target for new competitors, who can easily "cream skim" by offering modest discounts to the higher-paying customers. See, e.g., *Illinois v. ICC*, 722 F.2d 1341, 1347 (7th Cir. 1983). That is what happened here: dealers in other brands of gasolines offered a discount for cash and siphoned cash customers away from Amoco dealers.

To stem the flow Amoco decided to unbundle its cash and credit sales. The unbundling had two components. One was to reduce Amoco's wholesale price by an amount equal to the average cost of its credit card system. That is, Amoco removed the cost of that system from the gasoline price. The reduction in price was about 2.8 percent, later reduced to 2.1 percent. Amoco offered inducements to get the dealers to pass on the reduction to consumers; this was the "discount for cash" program. The other component of the unbundling was the imposition by Amoco on its dealers of a charge for credit card sales. The charge was 4 percent (reduced to 3 percent when the discount in the wholesale price was reduced to 2.1 percent) of the dealer's revenue from credit card sales. Thus, instead of reimbursing the dealer dollar for dollar for credit card sales made by the dealer to his customers, Amoco would now reimburse him only 96¢ (later raised to 97¢). Why was the charge for credit card sales a higher percentage of the wholesale gasoline price than the reduction in the price from unbundling—4 percent (reduced to 3 percent) versus 2.8 percent (reduced to 2.1 percent)? Because not all sales are made on credit. For example, if half were made on credit, a 4 percent charge on credit card sales would be needed to offset completely a 2 percent reduction in the wholesale price of gasoline. The

idea behind the unbundling was not to change Amoco's revenues (in the short run) but merely to shift the entire cost of the credit card program onto the shoulders of the credit card customers. If a dealer who had half cash and half credit card customers reduced his price to his cash customers by 2 percent and raised his price to his credit card customers by 2 percent, this would produce a 4 percent spread between the cash price and the credit card price, a spread equal to Amoco's credit card charge. If, as Amoco hoped, the dealer gained more cash customers from the discount for cash than he lost credit card customers by the surcharge for credit, both Amoco and the dealer would be better off. Of course a dealer who for one reason or another was much better at attracting credit card customers than cash customers might end up worse off.

Remus, we assume, is one of those dealers, and his class consists of the rest of them—though whether Remus or any other dealer actually lost money from the unbundling of cash and credit card sales that we have described has not been determined. Remus's principal complaint is that the unbundling altered the terms of his franchise unilaterally, in violation of the Fair Dealership Law. To this Amoco first replies, very feebly as it seems to us, that Remus enthusiastically embraced the discount for cash program—that is, agreed to pass along the wholesale price reduction to his cash customers in order to attract more of them—and therefore the franchise was modified by mutual consent of the parties. But Remus had no real choice. As long as some Amoco dealers passed on Amoco's wholesale price reduction to consumers in order to get more cash customers, competition would force the others to follow suit unless they wanted to lose their cash customers; and once Remus was thus forced to offer a discount for cash, he would have to charge a surcharge for credit in order to maintain his revenues. As Remus therefore had no alternative (at least if he wanted to remain an Amoco dealer) to accepting the unbundling, his best policy was to grin

and bear it. To say he consented to the change in the system of pricing is like saying that the author of this opinion consents to being 47 years old. Amoco forced the change on Remus and we must decide whether it is the kind of unilateral change that the Wisconsin Fair Dealership Law forbids.

Two provisions of the law are relevant. Section 135.03 forbids the franchisor to "terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." Section 135.04 requires the franchisor to give the dealer "at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances. The notice shall state all the reasons for termination, cancellation, nonrenewal or substantial change in competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency." Remus argues that the statute forbids what Amoco has done. The unbundling, he argues, "substantially change[d] the competitive circumstances" of Remus's dealership agreement without 90 days' prior written notice, and notice aside Amoco had no "good cause" to make this change when "good cause" is confined, as the provision for cure implies, to deficiencies on the part of the dealer.

The statute's main purpose is to give dealers a kind of tenure—like federal judges, or teachers, or workers in establishments covered by collective bargaining contracts. The franchisor may not terminate the dealer, either by canceling the franchise before its expiration date or by failing to renew it, without "good cause," which is the same basis on which a tenured employee can be terminated. Just as in the employment setting the term "good cause" refers to deficiencies in the employee's performance, so in the Wisconsin Fair Dealership Law "good cause" refers to the errors and omissions of the dealer. This is apparent from section 135.02(4), which defines "good cause" to mean either a "failure by a dealer to comply substantially with essential and reasonable requirements imposed

upon him by the grantor ... which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers," or "bad faith by the dealer in carrying out the terms of the dealership." Any remaining doubt that "good cause" refers to deficiencies of the dealer is dispelled by the statutory provision for cure. Before the franchisor can terminate a dealer for good cause he must, as we have noted, give the dealer 60 days to mend his ways, which implies that good cause for terminating a dealer comes from something the dealer does or fails to do, such as not paying on time or not keeping the gas station's restrooms clean. There may be some forms of misconduct so grievous that cure is not possible despite the literal terms of the statute (see, e.g., *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 59 (2d Cir.1984); *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 724–26 (7th Cir.1985) (dissenting opinion)), but that is not something to worry about here. The only point here is that termination requires fault by the dealer.

The provision about not "substantially chang[ing] the competitive circumstances of the dealership" may be intended simply to protect the dealer against "constructive termination," that is, against the franchisor's making the dealer's competitive circumstances so desperate that the dealer "voluntarily" gives up the franchise. Constructive termination is a problem in some employee tenure cases, where it is treated, as it should be, as termination. See, e.g., *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir.1984). The Wisconsin Fair Dealership Law makes the equation explicit. Not only may the franchisor not terminate or fail to renew the franchise outright; the franchisor may not drive the dealer out of business—say by doubling the wholesale price to him only, so that he cannot complete against other dealers in the same product. This interpretation is further suggested by the reference to discrimination in the statutory definition of good cause; if the franchisor treats two competing dealers unequally, the disfavored one

may be driven out of business. Cf. *Bresler's 33 Flavors Franchising Corp. v. Wokosin*, 591 F.Supp. 1533, 1537–38 (E.D. Wis.1984).

Remus does not argue constructive termination. He cannot. There isn't a shred of evidence that Amoco has ever wanted to drive Remus out of business. So far as appears he is a prize dealer. It is true that some dealers, and Remus may be one of them, may be hurt by unbundling. But that would be true of any system-wide change made by Amoco—for example, a general increase in the wholesale price of its gasoline, which Remus concedes would not be within the scope of the statute.

■ The statute may go somewhat further than we have suggested and protect dealers against new competition that has substantially adverse although not lethal effects. The statute is primarily designed to benefit existing dealers (it cannot benefit new dealers much, for they will have to compensate their franchisors for any favorable terms that the statute requires be included in the franchise); and what most dealers fear more than anything else is that the franchisor will increase the amount of intrabrand competition by placing new outlets, whether franchised or franchisor-owned, too close to the existing outlets for comfort. But even if the Wisconsin Fair Dealership Law is designed to give franchised dealers in Wisconsin some protection against such moves by franchisors (an issue we need not decide), this cannot help Remus. Amoco did not increase the number of dealers or open up new company-owned stations. Far from stepping up the competitive pressure on its dealers it unbundled its cash and credit card pricing in order to make it easier for them to respond to competition from dealers in other brands of gasoline.

We hesitate to conclude that the Wisconsin legislature meant to go further still—meant (as Remus contends) to prevent franchisors from instituting nondiscriminatory system-wide changes without the unanimous consent of the franchisees. Not only would such a law completely transform the relationship of franchisor and franchisee—much as a law which said that a company could not alter its prices or products without its employees' consent would completely transform the employment relationship—but it would not serve the interests of the franchisees as a whole. Even if most of them would benefit from a proposed system-wide change, a handful of dissenters might be able to block it by suing under the Fair Dealership Law, especially if (as Remus has attempted to do) they can use the class action device to increase the impact of the suit.

*Kealey Pharmacy & Home Care Services, Inc. v. Walgreen Co.*, 761 F.2d 345, 350 (7th Cir.1985), has no bearing on this case. Walgreen terminated all of its dealers in Wisconsin, and we held that the Fair Dealership Law does not exempt state-wide terminations. The present case does not involve termination, or its constructive equivalent; and *Kealey* does not stand for the proposition that the Fair Dealership Law forbids a franchisor to make system-wide changes without the consent of every franchisee. Walgreen (we found) was trying to eliminate the dealers who had built its reputation in Wisconsin, so that it could open its own stores and appropriate the goodwill that the dealers had created. See *id.* This was just the sort of conduct that the Wisconsin legislature had wanted to prevent. There is nothing like that in this case. Amoco isn't trying to drive its dealers out of business or even make life more difficult for them; although some dealers may lose from the change in policy that Remus attacks, others will gain. We need not decide whether the logic of *Kealey* embraces a blanket termination motivated by a desire to withdraw from the market because of inadequate profits, an issue in *Lee Beverage Co. v. I.S.C. Wines of California, Inc.*, 623 F.Supp. 867 (E.D.Wis.1985), and *St. Joseph Equipment v. Massey-Ferguson, Inc.*, 546 F.Supp. 1245 (W.D.Wis.1982).

■ Remus's remaining claims do not require protracted discussion. His claim that Amoco used misrepresentations to get him to go along with the discount for cash

program would be important only if we accepted Amoco's argument that Remus had a choice; we don't, so it isn't. Remus's other claim is that charging for the credit card program violated the credit card contract that he had with Amoco. But there is nothing in that contract about the method of pricing the credit card service, just as there is nothing in the dealership contract about the price at which Amoco will sell gasoline or other products to Remus. Remus finds in the language "Company will purchase Dealer's/Jobber's credit sales tickets which comply with the terms and conditions of this Agreement and which are submitted within 30 days of the date of the transaction" an implied commitment by Amoco to purchase them dollar for dollar— that is, without levying a fee. But there is no basis for this implication in the language we have quoted or anywhere else in the contract. Anyway Amoco could have achieved the same result by continuing to reimburse dealers on a dollar for dollar basis and simply levying a separate 4 percent fee on all credit card sales. There is nothing in the contract to forbid this, yet it would put Remus in exactly the same box that he finds himself in as a result of Amoco's unbundling of cash and credit card sales. As Remus must have known when he signed the contract, Amoco was charging a higher gasoline price than it otherwise would have done, in order to defray the cost of financing the credit card program; yet Remus did not ask for a cap on the wholesale price. By switching to another method of financing Amoco did not violate any term of the credit card contract.

At the time the contract was made, it was customary as we noted earlier for Amoco to recoup the expense of the credit card program in the wholesale price of gasoline rather than separately, and a "course of dealing" (what is often called trade usage or custom) can be used to disambiguate an ambiguous contract. See Wis.Stat. § 401.205(3). But first there must be an ambiguity, and we cannot find any here. It is not true, as Remus argues, that the contract would be hopelessly one-sided unless construed to forbid Amoco to charge separately for credit card services. Remus concedes that before the unbundling the charge was buried in the wholesale price, yet he does not argue that because Amoco therefore could, without violating any contract, have raised its wholesale price another 10 cents a gallon in order to cover some inflated estimate of its credit card costs, the credit card contract was one-sided. Since Amoco has no wish to destroy its dealership system, most of the chimeras that Remus invokes really are chimerical; and so far as the danger of being discriminated against by Amoco is concerned the statute protects Remus from that.

AFFIRMED.