Steve MONTGOMERY, James N. Fash and Donald R. Hall, Plaintiffs-Appellants,

v.

AMOCO OIL COMPANY, Defendant-Appellee.

No. 85–2750.

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1986.

Decided Nov. 3, 1986.

Christian B. Carisch, Lieber, Carish & Woods, Indianapolis, Ind., for plaintiffs-appellants.

Frank Cicero, Jr., Richard C. Godfrey, Kirkland & Ellis, Chicago, Ill., William P. Wooden, Wooden, McLaughlin & Sterner, Indianapolis, Ind., for defendant-appellee.

Before BAUER, Chief Judge, CUDAHY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

In 1982, Amoco Oil Company (Amoco) introduced its Discount for Cash Program (DFC) to Indiana dealers and jobbers (dealers).[1] Through DFC, Amoco reduced the price it charged dealers for a gallon of gasoline and it began charging the dealers a fee on each credit sale. Prior to DFC, Amoco had included the cost of its credit card system in the price dealers paid for gasoline.

The appellants are Indiana dealers who allege that the fee on credit sales under DFC violates both the existing credit card agreement between Amoco and its dealers and the Indiana Deceptive Franchise Practices Act, Ind.Code §§ 23-2-2.7-1 to 23-2-2.7-7 (1976) (IDFPA). The district court granted Amoco's motion for summary judgment. It held that Amoco had not breached the credit card agreement because the agreement was silent as to any fee. The court further held that the IDFPA did not apply to the agreement at issue, and that, even if the IDFPA did apply in this case, it had not been violated. We affirm the judgment of the district court.

*Facts*

Amoco sells gasoline and other petroleum products to independent service station operators. To become an Amoco dealer in Indiana, a dealer usually executes two agreements with Amoco: 1) a "342 Lease Agreement," which provides that Amoco will lease the service station to the dealer; and 2) a "462 Supply Agreement," which provides that Amoco will sell the dealer Amoco gasoline and products which the dealer will resell to the public. Under these agreements, Amoco determines the price at which it will sell gasoline to the dealers. The service station operators establish the retail price charged to the customers.

Amoco also offers its dealers the opportunity to participate in the Amoco credit card system. A dealer who decides to take part in the system enters into a separate written credit card agreement. The credit card agreement provides that "in consideration of the mutual promises herein contained, Company agrees to buy and Dealer/Jobber agrees to sell credit sales reflected on the Dealer/Jobber SVB Log Sheets on the following terms and conditions." The agreement contains provisions specifically establishing the products for which the dealer may accept the credit card, the dealer's responsibilities when accepting a credit card, and Amoco's obligation to purchase the credit sales free from dispute. However, the contract neither addresses which party must bear the costs for the credit card system nor indicates the method that may be used to recover those costs.

At the time that the dealers in this case entered into the credit card agreement, Amoco did not charge a fee on credit sales. Instead, the costs of the credit card system were included by Amoco as part of the cost for each gallon of gasoline. The dealers realized that the costs associated with the system were included in the price Amoco charged for the gasoline. Montgomery Dep. at 111-12; Hall Dep. at 116-20; Appellants' Br. at 21. Amoco informed the Indiana dealers that in July, 1982, it would reduce the price it charged the dealers for a gallon of gasoline and begin charging a fee on all credit sales.[2] By "unbundling" the cash and credit sales and imposing the entire cost of the credit card system on the credit sales, Amoco hoped that dealers would be able to reduce the price they charged cash customers. *See Remus v. Amoco Oil Co.,* 794 F.2d 1238, 1239 (7th Cir.1986).[3]

---

**1.** A dealer is a service station owner who sells directly to the motoring public. A jobber is an intermediate distributor who resells the gasoline to other dealers. In this opinion, we will refer to both dealers and jobbers as dealers.

**2.** Initially, Amoco reduced the price of gasoline by 2.8 cents per gallon and charged a 4% fee on

all credit card sales. In October, 1982, Amoco established the present rates at a 2.1 cents per gallon discount and a 3% fee on credit sales.

**3.** In *Remus v. Amoco Oil Co.,* 794 F.2d 1238 (7th Cir.1986), this court considered allegations similar to those made in this case. The court held that Amoco had not breached the credit card

On February 28, 1983, more than six months after DFC began, appellants filed suit in state court. They alleged that Amoco had breached the credit card agreement and violated the IDFPA. Amoco removed the case to the United States District Court for the Southern District of Indiana on the ground of diversity of citizenship. On September 9, 1985, the district court granted Amoco's motion for summary judgment. The district court held that, because the credit card contract was unambiguous, the intent of the parties had to be determined from the express language used in the contract. Because the credit card agreement contained no provision which either permitted or prohibited Amoco from imposing a fee on credit sales, the court held that the imposition of such a fee by Amoco neither violated nor modified the agreement. R. 30 at 8. The district court also held that the credit card agreement was not a franchise agreement covered by the IDFPA. *Id.* at 11. As an alternative holding, the district court ruled that, even if the IDFPA did apply, there had been no violation of the statute since there had been no modification of the agreement. The appellants appeal both determinations.

*Breach of the Credit Card Contract*

In this diversity case, we must determine whether, under Indiana law, Amoco breached the credit card agreement by imposing a fee on credit sales. "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties, as expressed in the language used, and to give effect to that intention, if it can be done consistently with legal principles." *Walb Construction Co. v. Chipman,* 202 Ind. 434, 441, 175 N.E. 132, 134 (1931). The first step in our analysis must be a careful examination of the contract itself. *See Evansville-Vanderburgh School Corp. v. Moll,* 264 Ind. 356, 362, 344 N.E.2d 831, 837 (1976). Unless a contract is ambiguous, the "four corners doctrine" prohibits the

court from looking beyond the provisions in the agreement:

> In the absence of an ambiguity it is not within the function of the judiciary to look outside of the instrument to get at the intention of the parties. Their sole duty is to find out what was meant by the language of the instrument. In other words, the object to be attained in interpreting a contract is to ascertain the meaning and intent of the parties as expressed in the language used.

*Jenkins v. King,* 224 Ind. 164, 171, 65 N.E.2d 121, 123 (1946). A careful examination of the contract reveals no ambiguity. We agree with the district court that "no specific provision of the contract prohibits Amoco from collecting a credit card fee, and that no specific provision requires Amoco to provide [appellants] with the credit card system free-of-charge." R. 30 at 6.

The dealers argue that, although there is no express provision governing the fee on credit sales, the contract contains an implied commitment to purchase the credit sales on a dollar for dollar basis. In *Remus,* this court examined a credit card contract identical to the one in this case. After examining the entire contract, we determined that it did not contain an implied commitment because "there is nothing in the contract about the method of pricing the credit card service." *Remus,* 794 F.2d at 1242. Therefore, the court concluded that the credit card agreement was not ambiguous. *Id.* Similarly, the contract at issue in this case is not ambiguous. Our task, then, is to determine the intent of the parties, based upon the language of the contract and Indiana law.

■■■ Appellants argue that, because no provision of the credit card contract specifically permits Amoco to recover the costs of the system through a fee on credit sales, we must conclude that the parties intended to prohibit such a fee. Consequently, they

agreement or violated Wisconsin's Fair Dealership Law. Although *Remus* is not controlling in this case because it involved a contract governed by Wisconsin law, the court's explanation

of the Discount for Cash Program is insightful and its analysis of the credit card agreement is persuasive.

continue, the imposition of the fee is either a breach of the contract or a modification of the contract without consideration. On the other hand, Amoco argues that nothing in the agreement evidences an intent that Amoco would provide the credit card system without imposing the costs of the system on the dealers and that the dealers were aware that the cost of the credit card system was included in the price they paid for gasoline. Amoco also points out that the agreement manifests no intention to require Amoco to continue to use such a method for recovering the costs of the system.[4]

Indiana law establishes a presumption: "that which is not in the instrument was intended to be left out." *Siler v. Colosimo,* 89 Ind.App. 680, 166 N.E. 667, 668 (1929). We conclude, therefore, that the parties did not intend to limit in any way Amoco's ability to recover the costs of the credit card system. The contract creates no bargained for expectation that Amoco would not impose a fee on the credit sales. When Amoco began charging the fee on the credit sales, it was not imposing a new cost on the dealers.[5] In establishing the DFC program, Amoco merely unbundled the cash and credit sales and instituted a program which imposed the entire cost of the credit card system on credit sales rather than on all sales. Amoco neither breached an obligation created by the contract nor altered a provision contained in it.[6]

### Indiana Deceptive Franchise Practices Act (IDFPA)

Appellants argue that Amoco violated section 23–2–2.7–1(3) (1976)[7] of the IDFPA which prohibits any franchise agreement from containing a provision which allows substantial modification of the franchise agreement by the franchisor without the consent in writing of the franchisee. Pursuant to Ind.Code § 23–2–2.7–5 (1976), an agreement which relates to the business of selling gasoline and/or oil, primarily for use in vehicles, is a franchise agreement subject to the provisions of the IDFPA, if under the contract:

(1) A franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor; (2) The operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising,

---

**4.** As this court noted in *Remus,* 794 F.2d at 1242, the parties could have reached agreement on some provision which would have limited Amoco's ability to recover the costs of the credit card sales. However, the credit card agreement does not contain such a provision.

The dealers argue that we must consider the practice at the time the credit card agreements were signed. They argue that, because Amoco was not charging a fee at that time, Amoco was bound to continue to allocate the costs of the system in the same way. Indiana law prohibits us from considering extrinsic evidence when the contract itself is not ambiguous. *Evansville-Vanderburgh School Corp. v. Moll,* 264 Ind. 356, 362–63, 344 N.E.2d 831, 837 (1976).

**5.** The dealers argue that a genuine issue of material fact concerning whether the credit sales fee accurately reflects the costs of the credit system remains unresolved. This is not an issue of material fact. Neither the credit card agreement nor the Indiana Deceptive Franchise Practice Act, Ind.Code §§ 23–2–2.7–1 to 23–2–2.7–7 (1976) (IDFPA), limits the amount Amoco can recover to the costs involved in maintaining the system.

**6.** It is a basic principle of contract law that: "As a contract consists of a binding promise or set of promises, a breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract." 11 S. Williston, *Williston on Contracts* § 1290 (3d ed. 1968). Amoco never failed to perform any promise that forms the whole or a part of the credit card agreement.

**7.** Ind.Code § 23–2–2.7–1(3) (1976) provides:
*Franchise agreement—Unlawful provisions.* —It is unlawful for any franchise agreement entered into between any franchisor and a franchisee who is a resident of Indiana to contain any of these provisions:

\*   \*   \*   \*   \*   \*

(3) Allowing substantial modification of the franchise agreement by the franchisor, without the consent in writing, of the franchisee. Section 23–2–2.7–1 was amended in 1985. However, this case arose before those amendments became effective and is therefore governed by the earlier version of the statute.

or other commercial symbol designating the franchisor or its affiliate.... Ind.Code § 23–2–2.5–1(a) (1976). The district court decided that, in determining whether the contract at issue is a franchise agreement, a court must consider only that contract which the party claims violates the IDFPA. Focusing only on the credit card agreement, the district court concluded that the contract established a medium of exchange for goods or services, but it did not grant the franchisee a right to dispense goods or services. R. 30 at 10. The court also held that, even if the Act applied, it had not been violated. *Id.* at 11.

■ We find it unnecessary to decide which agreement (or agreements) must be considered to constitute the franchise agreement for purposes of the IDFPA. The DFC program was not inaugurated pursuant to a provision "[a]llowing substantial modification of the franchise agreement by the franchisor, without the consent in writing, of the franchisee." Ind. Code § 23–2–2.7–1(3). Thus, even if the Act applies, it has not been violated.[8]

*Conclusion*

Prior to July, 1982, Amoco recovered the costs associated with its credit card system by charging its dealers a higher price for its gasoline. With DFC, Amoco removed the costs of the credit card system from the price of gasoline and instead, began charging dealers a fee on credit sales. Although it could not dictate how dealers would respond to the reduction in the cost of gasoline, Amoco had anticipated that the reallocation of costs would permit dealers to reduce the price charged to customers for cash sales and to impose the entire cost of credit sales on those who purchased gasoline with a credit card. Amoco's decision to unbundle the cash and credit sales was neither a breach of the credit card contract nor a violation of the IDFPA. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

---

**8.** Appellants also allege that, when Amoco instituted the DFC program, it threatened to place any dealer who refused to pay the credit sales fee on gasoline shut-off. Ind.Code § 23–2–2.7–2 (1976) (which was also amended in 1985) provides:

*Unlawful acts and practices.*—It is unlawful for any franchisor who has entered into any franchise agreement with a franchisee who is a resident of Indiana to engage in any of these acts and practices in relation to the agreement:

    (1) Coercing the franchisee to:

        \*      \*      \*      \*      \*      \*

    (iv) Enter into any agreement with the franchisor or any designee of the franchisor, or do any other act prejudicial to the franchisee, by threatening to cancel or fail to renew any agreement between the franchisee and the franchisor. Notice in good faith to any franchisee of the franchisee's violation of the terms or provisions of a franchise or agreement does not constitute a violation of this provision.

The district court did not directly comment upon this argument and, in their opening brief in this court, appellants make no specific argument in this regard. Their total submission is a brief, two-sentence reference in the statement of facts, Appellants' Br. at 5, and a citation to the above statutory section. *Id.* at 18. Under these circumstances, the matter is hardly properly presented.