CONRAD'S SENTRY, INC., Conrad's, Inc. and T & J Foods, Inc., Plaintiffs,

v.

SUPERVALU, INC., Defendant.

No. 04–C–0350–C.

United States District Court, W.D. Wisconsin.

Feb. 14, 2005.

Joseph P. Wright, for Plaintiffs.

Valerie L. Bailey–Rihn, Quarles & Brady, Madison, WI, for Defendant.

OPINION AND ORDER

CRABB, District Judge.

This is a civil action in which three Sentry stores are suing under the Wisconsin Fair Dealership Law, Wis. Stat. ch. 135, contending that the conduct of defendant Supervalu, Inc. since taking over the Sentry grocery store franchise has changed the competitive circumstances of their dealership agreements, substantially, discriminatorily and with the effect of constructively terminating those agreements. Plaintiffs seek money damages and a declaratory judgment that defendant's constructive termination of the agreements does not trigger various rights that defendant would otherwise have under the agreements. Defendant has moved for summary judgment and both sides have moved to strike portions of affidavits filed by the other. Diversity jurisdiction is present. 28 U.S.C. § 1332.

I find that defendant stepped into the shoes of its predecessor when it purchased the Sentry franchise from the bankrupt Fleming Companies, Inc. Thus, in determining whether plaintiffs shared a "community of interest" with defendant, I will treat plaintiffs' relationship with defendant and its predecessors as one agreement. As a consequence of this conclusion that the parties' rights and obligations derive from the original dealership agreements, I must dismiss plaintiff Conrad's, Inc. from this suit. Conrad's, Inc. entered into an agreement with defendant's predecessor that predates the enactment of the law and for that reason, cannot claim the law's protections. I conclude that the remaining plaintiffs cannot establish that the kinds of changes that defendant has made in its

operation of the Sentry stores amount to a violation of the fair dealership law in the absence of a showing either that defendant made the changes with the intent to cause the stores to go out of business or that the changes discriminate against plaintiffs in relation to other operators of Sentry stores. Plaintiffs cannot show intent to terminate them but on the present record, the issue of discriminatory effect is disputed.

Before taking up the motion for summary judgment, I will address the parties' motions to strike certain evidence.

## I. MOTIONS TO STRIKE

Plaintiffs have filed a motion to strike portions of an affidavit filed by William Chew on the ground that Chew's answers to questions put to him during his deposition show that he had no personal knowledge to support the statements he made in his declaration concerning the computer systems that defendant found in place when it became plaintiffs' grantor. Had Chew not been intimately involved in the decisions concerning the systems, his testimony might constitute hearsay, as plaintiffs contend. However, he was testifying to information he had gained while heading up the acquisition of the Sentry distributorship and the transition to defendant's systems and procedures. In that capacity, he would have had first-hand knowledge of defendant's reasons for not purchasing the Fleming Company's computer systems. Plaintiffs' motion to strike will be denied.

Defendant's motion to strike focuses on the affidavits of Gaarder R. Paynter and Molly Cross and certain deposition testimony of Glenn Palmquist. As to Paynter, the objection is untimeliness. Paynter was named as an expert and filed his expert report on September 17, 2004. Defendant contends that the opinions he gave in his later-filed affidavit about defendant's general systems and procedures are not based on his personal knowledge as a manager of a Sentry store and a former Fleming employee but are in the nature of expert opinion and should have been disclosed in his original expert report. I agree and will limit Paynter to the opinions he gave in his September report, because plaintiffs never asked for or obtained permission for Paynter to submit additional opinions. Therefore, I will grant the motion to strike paragraphs 8, 11–16, 19 and 21–23 of the Paynter affidavit.

As to Cross's affidavit, defendant objects on the ground of lack of foundation to Cross's summary of visits to Sentry stores from defendant's retail business consultants. Defendant argues that the record Cross relied upon in her summary did not contain all the information regarding the visits and the summary does not meet Fed.R.Evid. 803(6)'s standards for a business record exception from the hearsay rule. Defendant's objection goes to the weight of the evidence on which Cross relied. I will leave it to the jury to determine what weight, if any, it will give the summary.

Plaintiffs do not oppose defendant's motion to strike the portions of Palmquist's deposition in which he testified as to conversations Mr. Stinebaugh had with defendant's personnel. That motion will be granted.

## II. MOTION FOR SUMMARY JUDGMENT

From the parties' proposed findings of fact, I find that the following facts are undisputed and material.

### A. *Undisputed Facts*

#### 1. *Background*

Plaintiffs Conrad's Sentry, Inc., Conrad's, Inc. and T & J Foods, Inc. are independent owners of Sentry stores. All three are incorporated in the state of Wis-

consin and have their principal places of business here. Defendant Supervalu, Inc. is a Delaware corporation with its principal place of business in Minnesota.

For a number of years, Fleming Companies, Inc. and its predecessor, Godfrey Company, were the suppliers for plaintiffs and a number of other independent Sentry stores. In turn, each owned the trademarks and other intellectual property rights to the Sentry label. As suppliers, each handled the technology for each store's business, buying, pricing, advertising, Sentry card (the E–Z Save card that customers use to obtain discounts on featured items), freight and fees.

To become a Sentry affiliate, an independent grocery store owner had to sign certain agreements with Fleming (or Godfrey) covering the operation of the store. In the majority of cases, Fleming would negotiate a prime lease with the owner of the land upon which the store was built. Fleming would then execute a sublease with the independent Sentry owner. In return, the Sentry operator agreed to purchase product from Fleming. The agreement gives defendant the option to purchase any store owner's equipment and inventory should the owner desire to transfer them or sell the retail food business or dissolve or terminate the business at a certain location and specifies how the purchase price for these items is to be calculated.

On April 1, 2003, Fleming filed for bankruptcy protection. The filing triggered supply problems for the Sentry stores because vendors were reluctant to supply to Fleming.

After some maneuvering in the bankruptcy court that does not bear directly on the issues in this case, Fleming was allowed to sell its wholesale distribution business to C & S Wholesale Grocers, Inc., free and clear of any liens, assume its contracts with the independent Sentry store owners and assign them to defendant. (At the time, there were approximately 54 Sentry stores owned by 43 business entities.) When the store owners objected to Fleming's proposed course of action, defendant worked out the following agreement with them: if the prime lease or sub-lease was not assigned to the Sentry store owner or assumed by defendant, the parties would terminate the Sentry "Standby Agreement or Franchise Agreement" and if the prime lease or sub-lease was rejected, the Sentry store owner would be free to pursue other business arrangements for the property. With this agreement in place, the Sentry owners withdrew their objections.

When defendant added the Sentry stores to its existing customer base, it was supplying 5,377 retail customers in 48 states out of 25 distribution facilities. It faced certain difficulties in assimilating the Sentry stores, particularly because it was unable to support all of the information systems Fleming had in place. It did not have access to all of the systems; its own systems were not compatible with all of Fleming's systems, some of which were antiquated; it did not have the technology to support Sentry's E–Z Save card items in full; and C & S Wholesale had purchased some of Fleming's computer systems for its exclusive use. Defendant decided that assimilation required a transition to its own systems.

To prepare for the transition, defendant met twice with the Sentry store owners before it acquired the Sentry contracts, in August and in September 2003. At the second meeting, defendant discussed specific system changes that it identified as the number one challenge. Defendant told the owners that some manual processes would be necessary in the interim, that there would be new contacts at the Pleasant Prairie warehouse and that there

would be "bumps in the road." Defendant emphasized that changes would be made, including the institution of an "activity based sell" (ABS) system of pricing that all of its customers used, and that the Sentry store owners must understand and use if they were to buy at the best price points. The ABS system is more complex than a flat system that charges the same price for every owner. It took defendant six months to implement its "ABS scorecard," a form that tells a store owner such things as what its fees are.

The assimilation problems were exacerbated when several key Fleming employees left defendant for opportunities with a competitor. The parties experienced retagging problems and difficulties in finding an advertising program for the stores that would maintain their gross profit margins. Defendant met regularly with the Sentry Owners' Advisory Committee, whose members are elected by the Sentry owners. It communicated weekly with the store owners, who complained repeatedly about defendant's advertising program, markdowns and choice of sale items.

The ad committee changed the way it operated, when Robert Jaskolski became its chair In April 2004. He helped establish defendant's delivery program for direct store purchases (items that the stores buy directly from suppliers other than defendant). Almost all of the store owners have taken over direct store delivery themselves because of problems resulting from Fleming's bankruptcy and the transition to defendant's system.

Defendant has developed a computerized system, known as Enterprise Advantage, that is being tested by a pilot store but has not yet been made available to store owners. Also, it has developed a Center Store Strategy, designed "to recover grocery, particularly grocery and general merchandise, health and beauty care sales that the mass merchandisers have"

been taking away from Sentry stores, which was to be implemented in January 2005. Defendant allows store owners the choice of implementing these new systems; it does not require that they do so.

Defendant did not create a Sentry strategic plan until more than a year after it acquired the franchise. Fleming had never created one.

Plaintiffs are dissatisfied with the model defendant uses for creating its five pricing zones for Sentry stores. The model is intended to balance competitiveness with profitability. To measure profitability, a store owner would have to know what a retailer pays for the goods that it sells (the retailer's "landed costs"). The model estimates landed costs on the basis of averages although landed costs for the same grocery item may vary from one store to another. When defendant finally completed the five-zone strategy in June 2004, the competitive information that it fed into the model consisted of prices from two Pick'N Save stores in the Milwaukee area and a Copps store in Madison. It did not include competitive information from Cub or Woodman's grocery stores.

Defendant does not use its strategic pricing model to tell the owner of a particular store what retail prices to set for the market environment of that store. The advisory board directed it not to make this service available to individual stores.

In June 2004, plaintiffs filed this action, alleging that defendant had constructively terminated their dealerships or substantially changed their competitive circumstances by implementing changes after its purchase of the Sentry assets.

2. *Parties*

a. Conrad's Sentry, Inc.

Conrad's Sentry, Inc. entered into an original Sentry Foods Affiliation Agree-

ment with Godfrey dated November 11, 1986, which provided that it would remain in force from the date of the agreement "and for so long as the Retailer operates a retail food supermarket business at the store location unless sooner terminated as herein provided." It provided also that Godfrey would develop a marketing and administrative program and other program services to meet the reasonable needs of the Retailer, Godfrey and other retailers in the same trading area and that, in doing so, Godfrey would consult with the Retailers from time to time. Godfrey promised to make available such other services as it made generally available to other affiliated retailers from time to time, with the prices for the services subject to change from time to time.

On July 11, 2002, Conrad's Sentry executed a facility standby agreement with Fleming, which provided that

> Except as *hereinafter* provided, the Products sold to Retailer pursuant to this agreement shall be priced, and other terms of sale shall be established, at levels which are generally consistent with the current Sales Service Plan pursuant to which Retailer is purchasing products for the store ... as amended from time to time by Fleming (the "Selling Plan"), provided that such amendments shall be applicable to all similarly situated customers of Fleming purchasing inventory pursuant to such a Selling Plan.

Under this agreement, Conrad's Sentry was required to purchase products from Fleming or incur a 3% fee each year. The maximum term of the facility standby agreement is 20 years.

Conrad's Sentry is still purchasing product from defendant and no one at defendant has told the store that it wants to terminate it as a Sentry store. Conrad's Sentry's year-end financial statement for the twelve months ending February 2004 shows net earnings before interest, taxes, depreciation and amortization of a negative $27,640.71. Net earnings were down from a positive $68,390.97 from the previous fiscal year. However, total expenses outside defendant's influence increased $71,263. These included rent, salaries, benefits and miscellaneous expenses. Fleming was supplying Conrad's Sentry from February 23, 2003 until September 2003. For the four months ending June 28, 2004, Conrad's Sentry had net earnings of a positive $30,932.

b. Conrad's, Inc.

Plaintiff Conrad's, Inc. is a Wisconsin corporation operating a Sentry grocery store in Sun Prairie, Wisconsin. It executed a Sentry operating agreement with Godfrey in June 1967 that remains the only agreement in place between Conrad's and defendant. It has not been modified or changed since it was executed, although it has been assigned to Fleming and then to defendant. The agreement has no specific termination date, but provides in Section 4 that the Retailer (Conrad's) must give Godfrey (now defendant) the option to purchase the assets of Conrad's upon termination of the relationship. It provides also that "the Retailer shall fully accept the distributor's policies established from time to time in regards to facilities and methods of operation in order that the Sentry Stores develop and maintain a strong united group that has effective meaning to the consumers and continuing value to all participating Retailers and Distributors."

At present, plaintiff Conrad's is purchasing products from defendant. It does not contend that defendant is trying to terminate it as a Sentry dealer. Conrad's year-end financial statement for the twelve months ending June 26, 2004 shows net earnings before interest, taxes, deprecia-

tion and amortization of $359,462.68. Net earnings for June 29, 2003 through June 26, 2004 were down from the previous fiscal year but part of that decline may be attributable to Fleming's problems, because it was Conrad's supplier from June 26, 2003 until September 2003, when defendant took over. Total expenses outside defendant's influence went up $60,403. These included rent, salaries, benefits, depreciation and miscellaneous expenses.

### c. T & J Foods

Plaintiff T & J Foods operates a Sentry store on Cottage Grove Road in Madison, Wisconsin. On August 10, 1996, it executed a franchise agreement with Fleming, which provided that

> We [Fleming] reserve the right to change or modify the concept of Sentry Stores and the system presently identified by the Marks. We may adopt and use new or modified trade names, trademarks or service marks, new products, new equipment or new techniques. You must accept and use those changes as if they were part of the Agreement.

According to the agreement, Fleming had developed and would administer an advertising and marketing program for Sentry stores and would bill the stores weekly for their proportionate share of the advertising and marketing costs and on request, Fleming would "make available other services and programs that [it offers] to other Sentry franchises, upon reasonable costs for these services and programs." Further, it provided that T & J Foods could assign the agreement, with Fleming's approval, that Fleming had a right of first refusal if a third party offer was made for the store or the property, equipment or inventory and that upon termination of the agreement or a sale of the store, T & J Foods would not compete in the grocery business for two years within a ten-mile radius of the old store.

No one has told T & J Foods that it can no longer operate as a Sentry Store. Defendant has not attempted to terminate its relationship with T & J Foods, which continues to purchase product from defendant. Defendant has told T & J Foods that if it wishes to sell its business, defendant would help it do so.

T & J's earnings before interest, taxes, depreciation and amortization were a negative $19,000 for the eleven-month period ending August 28, 2004. However, total expenses outside defendant's influence increased $142,231 for such items as rent, salaries, benefits and miscellaneous expenses.

### 3. Defendant's operations

Defendant's prices and systems apply uniformly to all Sentry store owners. However, the price for a particular item may vary from store to store, depending on the store's product mix and its eligibility for the rebates that are available for large purchases.

Plaintiffs and other stores did not receive a budget from defendant from September 2003 to April 2004.

When Fleming was the distributor, it maintained a database of all prices and retail prices that should be billed by the vendors for direct store deliveries. Also, it negotiated payment terms for these direct store deliveries and reconciled the statements. For these services, Fleming charged 1% of the weekly direct store delivery billings. At the time defendant took over the distributorship, it did not have an identical direct store delivery program. In developing such a system, it charged the Sentry store owners only .5% of weekly billings of direct store delivery until it had determined that the system was accurate.

When Fleming was the distributor, it charged the same cost for product and the same fees for all customers with a variable cost for transportation or freight charges. Defendant's ABS system sets a cost for each product plus additional fees.

Fleming had employee drivers who delivered product to coolers within the stores, sometimes in the middle of the night. Defendant contracts with third party drivers who do not place product in store coolers or freezers.

Fleming used a four zone pricing model for all Sentry stores. Until April 2004, defendant either did not use the system or did not properly maintain it. (The exact deficiency is in dispute.)

Fleming had an advertising program with a four-week budget for each period. Until April 2004, defendant did not have such a budget for each period.

Fleming had an electronic bank system that took deductions from each store owner's account on Tuesday mornings for product ordered the preceding week. Defendant's electronic bank draws occur on early Monday morning and are for proper bills owed by the stores for product purchased previously. These Monday morning draws are the same for all customers. Defendant's billing is based on product billed before Thursday morning at 4:00 a.m.; Fleming's billing included product billed by the close of business on Thursday. Defendant has refused to change its schedule to conform to the one that Fleming followed.

At the beginning of the conversion to defendant's system, the stores had to be retagged. After the Sentry Advisory Board expressed its concern about the competitiveness of the Sentry store prices, the stores were retagged again in May 2004.

Unlike Fleming's rebate program, defendant's is based on volume.

### 4. Community of interest factors

All three of the plaintiffs devotes 100% of their personnel and all of their time to their Sentry store operations. Each holds itself out as a Sentry store and uses only the Sentry name. Each has at least one large Sentry sign outside and many smaller Sentry signs inside. Each uses grocery bags that say Sentry.

If plaintiffs were to change from defendant to a new supplier, the only physical changes they would have to make would be to take down their old signs and change their aisle signs (other than making the conversions in tagging and ordering systems that any new supply agreement might require).

Plaintiffs pay no fee to defendant for their franchise or for any other purpose. They cannot break down the total gross profits arising from the sale of private label products. The majority of the products they sell are national brands that they buy from defendant. Their stores are suitable for conversion to another kind of store.

Under the terms of their agreements, plaintiffs must follow certain rules of cleanliness and quality, participate in the advertising program and adhere to defendant's standards in the advertising and buying programs. Defendant administers the advertising and buying programs and agrees to make available to the store owners such services as it makes available to any other owner and to charge for those services.

Plaintiffs do not own the land upon which their stores are located or the buildings in which the stores operate, which are at least twenty years old. The grocery business does not require operators to do warranty or servicing work. Plaintiffs purchase Sentry specific department supplies from defendant and participate in

advertising with other Sentry store owners and defendant to increase traffic in their stores. Conrad's, Inc.'s advertising costs were approximately 5.59% of total sales for the year ending June 26, 2004 and its department supplies were approximately .78% of total sales. For the year ending February 28, 2004, Conrad's Sentry had advertising costs of 7.2% of total sales and its department supplies were .68%. For T & J Foods, the advertising costs for the eleven months ending August 28, 2004 were 7.33% of total sales and department supplies were .73%.

Plaintiffs continue to buy product from defendant. Defendant has never told plaintiffs that it does not want them to be Sentry store owners. To the contrary, it would like them to continue in that capacity.

OPINION

The Wisconsin Fair Dealership Law, Wis. Stat. § 135.03, prohibits grantors of franchises from terminating, cancelling, failing to renew or substantially changing the competitive circumstances of their dealership agreement without good cause. This case raises questions that focus on the last of the prohibitions: changes in competitive circumstances. Plaintiffs contend that the changes that defendant made in its working relationship with its "dealer" stores are significant changes in plaintiffs' competitive circumstances, so significant in fact that they amount to a constructive termination of at least one of the plaintiff dealerships and significant enough to be actionable as to the other two.

Moreover, plaintiffs contend, the changes are discriminatory in effect. To defendant's argument that all of the changes it has made have been applied uniformly to all of the Sentry stores, plaintiffs respond that the facts underlying this argument are in dispute. In plaintiffs' view, the facts show that defendant has favored larger stores through its ABS (Activity Based Sell) ordering system, its rebate system and the frequency of its visits to its affiliate store owners. Further, plaintiffs argue, defendant's statements to T & J Foods (offering to help it find a buyer) demonstrate that the manner in which defendant has implemented its changes is intended to capitalize on the difficulties of store owners and force the elimination of smaller Sentry stores.

A. *Applicability of Fair Dealership Law to Agreements*

At the outset, it is necessary to decide whether plaintiffs' agreements with defendant are even covered by the fair dealership law. Under Wis. Stat. § 135.02(3)(a), a dealership requires (1) an agreement (2) between two or more persons (3) by which a person is granted the right to sell or distribute goods or use a trade name, trademark or similar symbol and (4) in which there is "a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease agreement or otherwise." "Community of interest" is defined in § 135.02(1) as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services."

1. *Effective date of dealership agreements*

The initial question is to determine when the parties' agreements should be considered to have been in effect only since September 2003, when defendant took them over from Fleming in the bankruptcy proceedings or whether they are considered to be the same agreements plaintiffs entered in initially with Godfrey. If they are considered new ones it is questionable that plaintiffs could show that in the less than 18 months of the agreements' exis-

tence, the parties have the community of interest necessary to show the existence of a dealership subject to the law.

The bankruptcy court's August 15, 2003 order approving the sale of Fleming's assets provided that the transfer to the purchaser would not subject the purchaser or any third party purchaser to any liability based on any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, substantial continuity or any employment contract. Defendant views this order as marking a clear distinction between the relationship plaintiffs had with Fleming and the relationship they have with defendant. Plaintiffs argue that bankruptcy court orders cannot override Wisconsin law, which governs the relationships that defendant assumed with plaintiffs and which is part of any contract subject to the statute. *Goossen v. Estate of Standaert*, 189 Wis.2d 237, 248, 525 N.W.2d 314, 319 (Ct.App.1994) ("Where the state's public policy is expressed in legislative acts, 'the statutory provisions "step in and control and regulate the mutual rights and obligations" of the parties to a contract relating to the subject matter of the statute.'") (quoting *Gordie Boucher Lincoln–Mercury Madison v. J & H Landfill*, 172 Wis.2d 333, 340, 493 N.W.2d 375, 378 (Ct.App.1992) (quoting *Von Uhl v. Trempealeau County Mut. Ins. Co.*, 33 Wis.2d 32, 38, 146 N.W.2d 516, 520 (1966))).

█ It is not necessary to decide whether the bankruptcy court's authority would extend to overriding the state's fair dealership law, because the bankruptcy court made no effort to exercise any such authority. The bankruptcy court specified that the purchaser of Fleming's assets took those assets free and clear of all claims of creditors, equity security holders and general partners of the debtor. It made no reference to any obligations under the fair dealership law. I conclude that when defendant assumed the contracts out of bankruptcy, it assumed the relationship with those dealers that Fleming had, but without any obligation to pay the claims of creditors, equity security holders and general partners. Therefore, with respect to the dealership agreements, defendant stepped into the shoes of Fleming and assumed Fleming's obligations under the fair dealership law.

To reach any other conclusion, I would have to ignore the binding nature of the contracts. Under those agreements, plaintiffs had no option but to continue their relationship with defendant as Fleming's successor, short of going out of business and allowing defendant to purchase their assets. They were not free to shed their obligations to defendant and continue their businesses under another name with a new distributor.

█ From this conclusion that the dealership agreements were ongoing, dating back to the dates on which they were first signed, it follows that Conrad's, Inc.'s agreement is not subject to the fair dealership law. Conrad's Inc. entered into that agreement with Godfrey in 1967; the fair dealership law took effect in 1974. The state supreme court held in *Wipperfurth v. U–Haul Co.*, 101 Wis.2d 586, 304 N.W.2d 767 (1981), that the law could not have retroactive effect without impairing obligations of contract in violation of article I, section 10 of the United States Constitution. Therefore, I will grant defendant's motion for summary judgment as it relates to plaintiff Conrad's, Inc.

### 2. *Community of interest*

█ Before deciding that the fair dealership law applies to the parties' agreements, it is necessary to determine whether the parties had the necessary community of interest, a subject to which courts have devoted many pages. In

1987, the Supreme Court of Wisconsin developed a multi-factor approach to guide lower courts in determining the existence of a community of interest. *Ziegler Co. v. Rexnord, Inc.*, 139 Wis.2d 593, 407 N.W.2d 873 (1987). Among the ten factors the court set out were the length of time the parties had dealt with each other, the dealer's financial investment in inventory, facilities and good will and the amount the dealer spends on advertising or promotions for the grantor's products. *Id.* at 606, 407 N.W.2d at 879. In the same decision, the court characterized a community of interest as incorporating both a continuing financial interest and interdependence, that is, one demonstrated by the "degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Id.* at 605, 407 N.W.2d at 879.

In some subsequent decisions, both state and federal courts have suggested that the community of interest inquiry can be narrowed to two factors: the degree to which putative dealers have made substantial, unrecoverable investments to promote the products of the alleged grantors and the significance of the revenues gained from the relationship. *E.g., Kenosha Liquor Co. v. Heublein Inc.*, 895 F.2d 418, 419 (7th Cir.1990) ("We have deduced from the structure and history of the [fair dealership law] a central function: preventing suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand."); *Guderjohn v. Loewen–America, Inc.*, 179 Wis.2d 201, 507 N.W.2d 115 (Ct. App.1993) (discussing *Ziegler* factors but emphasizing lack of substantial resources invested in relationship, along with minimal use of alleged grantor's marks and low levels of advertising for alleged grantor's products); and *Baldewein Co. v. Tri–Clover Inc.*, 2000 WI 20, ¶ 27, 233 Wis.2d 57,

72, 606 N.W.2d 145 (noting in dicta importance of investment of resources in relationship and derivation of substantial revenues from relationship). In *Central Corp. v. Research Products Corp.*, 2004 WI 76, 272 Wis.2d 561, 681 N.W.2d 178, however, the state supreme court returned to the *Ziegler* factors in holding that courts should be reluctant to find an absence of community of interest without giving a jury a chance to decide the issue. The court reached this conclusion despite the lack of any showing that in the case before it the alleged dealer had sunk any substantial, non-liquid resources into the relationship and despite evidence that the dealer derived only a small percentage of its total gross revenue from sales of the alleged grantor's products. The court noted the 20–year business relationship between the parties, the alleged dealer's significant financial investment in the construction of a warehouse that housed Research's products, its practice of keeping a substantial amount of Research's product in inventory, its practice of keeping spare parts for Research's products on hand and Research's desire to limit the alleged dealer's sales to a specific territory. In conformance with the state supreme court's holding that the *Ziegler* factors are determinative in examining community of interest, I will consider each of the factors as they relate to the parties' agreements.

a. *Ziegler* factors

■ The first of the *Ziegler* factors is the length of time the parties have been dealing with each other. Plaintiffs Conrad's Sentry and T & J Foods have been Sentry stores for 18 and 8 years, respectively. The second factor includes the extent and nature of the obligations imposed on the parties in their agreement. Under the terms of plaintiffs' agreements with defendant, plaintiffs must follow certain cleanliness and quality rules, participate in

the advertising program and adhere to defendant's standards for the advertising and buying programs. Defendant administers the advertising and buying programs and agrees to make available to the store owners such services as it makes available to any other owner and to charge for those services. The agreement gives defendant the option to purchase any store owner's equipment and inventory should the owner desire to transfer them or sell, dissolve or terminate the retail food business at a certain location. It specifies how the purchase price for these items is to be calculated.

*Ziegler's* third factor is the percentage of time or revenue that the alleged dealer devotes to the alleged grantor's products. Plaintiffs devote 100% of their own time and 100% of their personnel to their Sentry business, but the majority of the products they sell are national brands. The fourth factor is the percentage of the gross proceeds or profits the alleged dealer derives from the alleged grantor's products. Plaintiffs cannot break down their total gross profits from the sale of defendant's private-label products. The fifth factor is the extent and nature of the grant of territory. The store owners have no particular territories and no guarantee that defendant will not open another store near them.

The sixth factor is the extent and nature of uses of proprietary marks. Plaintiffs hold themselves out as Sentry stores. Their advertisements use only the Sentry name; each has at least one large Sentry sign outside and many smaller Sentry signs inside; and each uses grocery bags that say Sentry. The seventh factor is the extent and nature of their financial investment in inventory, facilities and good will. Plaintiffs have no investment in the land or buildings; they are on a leasing arrangement and defendant negotiates the leases for both. Plaintiffs pay no franchise fee to

defendant. Their stores are suitable for use as non-Sentry grocery stores, but plaintiffs are not free to change distributors without offering defendant the option of purchasing their inventory and equipment. The record does not disclose the extent of plaintiffs' investment that represents good will, if any.

The eighth *Ziegler* factor relates to the personnel devoted to the alleged dealership. As set out above, plaintiffs devote all of their personnel to the operation of their stores. As to the ninth factor, the amount the dealer spends on advertising, the undisputed facts are that plaintiffs spend at least 7.2% of their total sales on advertising. The tenth factor includes the extent and nature of any supplementary services provided to customers of the alleged dealer's products. As grocery store operators, plaintiffs do not provide warranty or service functions on the products they sell.

Although few of the factors weigh heavily in plaintiffs' favor, I am persuaded that a fair balancing of the factors establishes a community of interest among the parties. Technically, plaintiffs could convert quickly and relatively inexpensively to another distributor; in reality, their agreements prevent them from doing so. Plaintiffs have been holding themselves out for years as Sentry stores, tying their success to the Sentry name, logo and reputation, building up considerable goodwill for defendant and representing Sentry in their respective locations. It is evident that they share with defendant a common financial interest in the operation of the dealership and marketing of grocery products.

Therefore, I conclude that the agreements between defendant and Conrad's Sentry and T & J Foods are governed by the fair dealership law.

### C. *Substantial Change in Competitive Circumstances*

■ Section 135.03 of the Wisconsin Fair Dealership Law prohibits any grantor from terminating, cancelling, failing "to renew or substantially change the competitive circumstances of a dealership agreement without good cause." Plaintiffs have alleged that defendant has made a number of changes in the way it operates the distributorship, but, with one possible exception, they have not shown that any of these are changes in the competitive circumstances of the dealership agreement. Their agreements with defendant say little about defendant's obligations to support its affiliate stores. This makes it difficult for plaintiffs to argue that defendant has made changes in the *dealership agreement* that are substantial enough to violate the dealership law. *Super Valu Stores v. D–Mart,* 146 Wis.2d 568, 574–577, 431 N.W.2d 721 (Ct.App.1988) (grantor's plan to franchise second store in dealer's market area did not violate fair dealership act when parties' agreement was non-exclusive, leaving grantor free to enter into agreements with other retailers). The possible exception rests on plaintiffs' allegations of discrimination: that the ABS system is biased toward larger dealers, as are rebates, and that defendant's business consultants visit plaintiffs less often than they visit larger stores.

Under the terms of the dealership agreements, defendant is obligated to provide each plaintiff "such other services as it makes generally available to other affiliated retailers from time to time" (upon that plaintiff's request). Armed with this provision and the fair dealership law's purpose of protecting dealers from unfair treatment by grantors, plaintiffs would have a viable claim if they can prove that the ABS system or any other aspect of defendant's operation of the dealership discriminates impermissibly among dealers.

Other than this exception, however, plaintiffs can extract little of use from the agreements with defendant. Nothing in the agreements requires defendant to maintain existing computer systems, avoid the need to retag stores more than once, retain former officers and employees of Fleming, create strategic plans and zone strategies promptly, base its zone strategy on competitive information from Cub and Woodman's grocery stores or run its ad program in any particular way. Obviously, plaintiffs would prefer that defendant manage the transition from Fleming as smoothly as possible, but nothing in their agreements obligates defendant to do so. (It seems equally obvious that defendant has its own interest in making as seamless a transition as possible.) Defendant's only obligation in this respect is to treat all of its dealers similarly. Plaintiffs have not adduced any evidence to suggest that the bumps in the road that defendant encountered were any less frustrating or disruptive to other Sentry store owners than they were to plaintiffs. Therefore, their claim of discriminatory treatment boils down to the ABS system, the rebates and the frequency of store visits.

However, plaintiffs have another claim. They contend that substantial changes in a dealership relation can be actionable in several circumstances, not just when the changes are discriminatory as to one or more dealers. They argue that changes are actionable if they result in losses to dealers that drive the dealers out of business or when they have effects that are "substantially adverse although not lethal." *Remus v. Amoco Oil Co.,* 794 F.2d 1238, 1241 (7th Cir.1986). In the category of "substantial but not lethal," they would put losses that are material to the dealership's continued existence and that significantly diminish the dealer's viability, its ability to stay in business or its ability to maintain a

reasonable profit but fall short of causing the dealership to go out of business.

In *Remus*, the court of appeals recognized the possibility that a dealer could sue under the law if the grantor took discriminatory steps to drive that dealer out of business "—say by doubling the wholesale price to him only, so that he may not complete against other dealers in the same product," *id.* at 1240. The court seemed to suggest that non-discriminatory adverse changes can never be actionable and added that its "interpretation is further suggested by the reference to discrimination in the statutory definition of good cause; if the franchisor treats two competing dealers unequally, the disfavored one may be driven out of business." *Id.* at 1240–41. In other words, if a grantor treats all dealers adversely but uniformly, it has not violated the fair dealership act. However, it is not clear that the court meant to suggest that the only dealers that can challenge actions that amount to constructive termination are those that can show that the changes are discriminatory. Two paragraphs after it made the cited statement, it noted that the fair dealership law does not exempt state-wide terminations in all situations. If across-the-board terminations are covered by the law, one would expect across-the-board treatment that amounts to constructive termination to be covered as well. One cannot make a reasoned case for applying the fair dealership law to one kind of termination and not the other. Construing the law to reach that result might open the door to system-wide constructive terminations by grantors who have reasons to abandon their dealerships and do not want to incur the law's penalties for terminations without good cause.

The court's statements in *Remus* suggest a framework for analyzing plaintiffs' claim. Plaintiffs may proceed if they can adduce evidence either that defendant made a change in the competitive circum-

stances of their dealership agreements that had a discriminatory effect on them *or* if they have evidence that defendant's actions were intended to eliminate them or all of its dealers from the state. It is critical that plaintiff-dealers can show an intent to terminate on the part of the grantor. It would not be enough to show that the grantor made bad management decisions; it might be enough if the plaintiff-dealers can show that the bad decisions were a cover for an intent to slough off the dealers and take over the markets they had developed.

I am not persuaded, however, by plaintiffs' contention that the fair dealership law applies to significantly adverse changes short of constructive termination that are not discriminatory in their application or effect. Plaintiffs have cited no case involving a Wisconsin dealership that supports this contention. The cases that address this point hold to the contrary. In *East Bay Running Store, Inc. v. NIKE*, 890 F.2d 996, 999 (7th Cir.1989), for example, the court of appeals rejected a dealer's contention that Nike had effected a substantial change in the competitive circumstances of the dealership agreement when it implemented a prohibition on sales by mail, catalog or electronic means. Before the change, East Bay was deriving approximately 90–95% of its sales from its mail order sales operation. Despite the impact of the ban on plaintiff, the court held that because it was a system-wide ban, it was non-discriminatory and therefore, not a change in competitive circumstances. *Id.* at 1000. The court was persuaded that the fair dealership law's "prohibition of substantial changes in competitive circumstances was not meant to prohibit non-discriminatory system-wide changes." *Id.* (citing *Remus*, 794 F.2d at 1240). This holding is consistent with the statement in *Remus*, 794 F.2d at 1241, that it is doubtful the Wisconsin legislature would have

meant to prevent grantors from instituting non-discriminatory system-wide changes without the unanimous consent of the dealers. Were the decision otherwise, one holdout like East Bay who could show significant adverse effect could put an end to any system-wide changes Nike might want to institute.

I conclude that Wisconsin law would allow plaintiffs to proceed with claims that they were subjected to changes in their competitive circumstances that were discriminatory or that were intended as constructive termination. They may not go forward with their claim that they suffered adverse consequences that were neither discriminatory nor the equivalent of constructive termination.

Plaintiffs have some evidence that defendant's ABS system, its rebates and the frequency of its store visits were discriminatory in operation. Defendant denies that these programs were discriminatory in any respect, pointing out that the fair dealership law requires only similar and not identical treatment and that it is not enough to show that different store owners have different results under particular programs if the programs themselves are fair and non-discriminatory in application. It remains questionable whether plaintiffs can establish the discriminatory nature of these programs, but at this stage of the litigation I cannot say with certainty that no reasonable jury could find the programs non-discriminatory. However, plaintiffs cannot pursue their claim of intentional constructive termination because they have admitted that defendant wants them to continue as Sentry dealers. Having made this admission, they have no basis for arguing that defendant instituted its programs and made the decisions it did as a covert means of forcing plaintiffs to go out of business.

ORDER

IT IS ORDERED that defendant Supervalu, Inc.'s motion for summary judgment is GRANTED in all respects with the exception of plaintiffs Conrad's Sentry, Inc.'s and T & J Foods' claim that defendant has discriminated against them and other small Sentry stores in the institution of the ABS system, the rebate program and the frequency of store visits. FURTHER, IT IS ORDERED that plaintiffs' motion to strike portions of an affidavit filed by William Chew is DENIED; defendant's motion to strike paragraphs 8, 11–16, 19 and 21–23 of the Gaardner R. Paynter affidavit is GRANTED; and defendant's motion to strike those portions of Molly Cross's deposition that rely upon her summary of visits to Sentry stores by defendant's business consultants is DENIED.